[Civ. No. 13375.   Second Dist., Div. Two.   Dec. 15, 1941.]

Estate of ETHEL SHERWOOD BUCHER, Deceased. JOHN M. HARRIS, Appellant, v. MORRIS MELNIK, Respondent.

Moore & Welker, Fred W. Heatherly and Henry T. Moore for Appellant.

Stanley N. Barnes and Henry Haves for Respondent.

HANSON, J. *pro tem.*—This appeal by the contestant, the sole heir at law of decedent Ethel Sherwood Bucher, opposing the probate of her will, presents the single question whether there was any substantial evidence upon which a verdict for the contestant might properly be found. By its verdict the jury specially found that the will was procured by the undue influence of Dr. Morris Melnik, the proponent and sole beneficiary of the will. The trial court after the verdict of the jury, upon motion of the proponent, entered judgment admitting the will to probate notwithstanding the verdict.

In passing upon such a motion the trial court's inquiry "begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Juchert* v. *California etc. Co.*, 16 Cal. (2d) 500 [106 Pac. (2d) 886].) A motion for judgment notwithstanding the verdict "concedes as true the evidence on behalf" of the contestant, "with all fair and reasonable inferences to be deduced therefrom. . . . The power of a court in passing upon such motions is strictly limited. It has no power to weigh the evidence but is bound to view it in the most favorable light in support of the verdict." (*Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108, 117 [291 Pac. 184].) In short, the court must disregard conflicting evidence and give contestant's evidence all the value to which it is legally entitled, including every legitimate inference which may be drawn from the evidence. In a case such as this, where it is conceded, and where the jury necessarily could have found, that a confidential relationship existed between the decedent and the proponent, the trial court, upon the motion for judgment notwithstanding the verdict, was presented (if such a motion could be entertained—which we do not decide) with only two questions. These questions, presented to it as matters of law, were whether there was any substantial evidence (1) that the proponent was active or participated in procuring the execution of the will or in its preparation, and (2) that he unduly profited under its terms. If there was affirmative evidence on those two points then it was wholly unnecessary for the trial court to consider whether there were or were not additional matters of undue influence shown, as under such circumstances it would be its duty to deny the motion. (*Estate of Lances,* 216 Cal. 397 [14 Pac. (2d) 768].)

As we are of the opinion that the evidence was sufficiently substantial to have permitted the jury to find that there was undue influence practiced upon the decedent in the making of her will, we shall set forth only such evidence as favors the verdict. In short, we mention only those facts which the jury could have found were true, derived either from the testimony as given or properly inferred from the facts and circumstances shown.

The testatrix at the time she made her will was a widow fifty-nine years of age. She was a graduate of Wellesley College. She had been a librarian in the Library of Congress prior to her marriage, and shortly after her marriage was for a time the College Librarian of the University of California at Berkeley. Within twenty-two months of the time the decedent, Mrs. Bucher, first met an utter stranger to her, the proponent Dr. Morris Melnik, and engaged him as her personal physician, she had made her will leaving all of her estate to him, although she had paid every bill for medical services as rendered by him and was in no manner indebted to him. Moreover, after the execution of the will and up to her very last illness she likewise was billed and promptly paid every bill rendered by him. By the making of the will in question she caused a revocation of her will made in 1934 together with her 1936 codicil thereto, which had bequeathed and devised all her estate to her relatives and those of her deceased husband. What she knew or did not know about her new will or its contents is not disclosed by any evidence in this record, other than the testimony of the draftsman of the will who was selected for her by the proponent.

On September 7, 1937, proponent sent the testatrix by ambulance from his office to the hospital. The hospital chart indicated she was suffering from essential hypertension, arterioschlerotic heart disease, acute congestive heart failure and from an old cerebral thrombosis. Prior to that and in June, 1936, the proponent, with Dr. Goldsmith giving the anesthetic, operated on her for a goiter. As a result of the operation she suffered a secondary anemia, and on October 11, 1936, had her first stroke. The next month proponent operated on her for gallstones. On July 28, 1937, he again sent her to the hospital for post-operative hypophryopism, hyper-chromic anemia and because she was additionally suffering from an old cerebral thrombosis. Within a month after she left the hospital proponent again hospitalized her, but this time because of acute alcoholism. In yet another month she was returned to the hospital, as above stated, on September 7, 1937, where she remained until October 17, 1937. On September 8, 1937, proponent telephoned Mrs. Bucher's apartment house manager that Mrs. Bucher wished her will, which was in her desk, and her safety deposit box

key, which was in her bank book, likewise in her desk. He requested that these items be gathered up by the manager and that he would call for them on the following day. This he did. While calling the preceding day for some toilet articles belonging to Mrs. Bucher, proponent had instructed the manager that if anyone should inquire as to Mrs. Bucher's whereabouts no information was to be given other than to say she was under the doctor's care. He called at the apartment house mailbox for Mrs. Bucher's mail on several occasions.

Six days after Mrs. Bucher was hospitalized at the time in question—and during a period when the nurses had instructions from the proponent not to permit anyone to see her—the attorney, whom proponent selected to draft her will, and who for fifteen years had been the attorney of proponent's father-in-law and the latter's family, saw the testatrix in the hospital and was there introduced to Mrs. Bucher by the proponent. On September 16, 1937, the will was signed by the testatrix in the hospital. The witnesses were the attorney and Dr. Goldsmith, who is the office associate of proponent. Dr. Goldsmith testified, when he gave his deposition prior to the trial, that he did not recall whether Mrs. Bucher had signed the will when he affixed his name as a witness. At the trial he testified positively that both she and the attorney affixed their respective names, in his presence, before he signed it as a witness.

Matters indicative of Mrs. Bucher's condition both immediately prior and subsequent to the execution of her will—which indicate that Mrs. Bucher might easily be imposed upon—were these: She urged her apartment house manager (Mrs. Buckley) to put up her car and ride only in "Yellow Cabs" because there was danger from above, such as air raids. Testatrix followed this statement with the fact that she was making arrangements with the Yellow Cab Company to put a direct telephone line into the apartment. On the second morning in the hospital Mrs. Bucher telephoned Mrs. Buckley inquiring of her: "Do you think it is going to rain today?" And when Mrs. Buckley replied, "Well, it looks like a lovely day now, Mrs. Bucher," the latter responded: "Well, you know I am going on my honeymoon today. I am going to West Lake Park [Los Angeles]. Do you think there will be an air raid? Do you think it will be safe?"

Some two or three weeks after the will was executed Mrs. Bucher from the hospital telephoned Mrs. Buckley requesting that she call on her. When Mrs. Buckley did so she observed a marked change in Mrs. Bucher. She observed that Mrs. Bucher would lose the thread of her conversation and in doing so would just laugh and remark, "Oh, well, no matter."

Proponent testified that either on the day of the execution of the will or subsequent thereto Mrs. Bucher "very vaguely" told him she was going to remember him in some substantial way. On the trial he said that she had never told him she would remember him substantially.

Shortly prior to Mrs. Bucher's return to her apartment from the hospital on October 17, 1937, the proponent visited the apartment house manager, stating a nurse would return with Mrs. Bucher and that she would need a larger apartment. He requested the manager to reduce the regular rate of the apartment he selected. He placed the request on the basis of Mrs. Bucher's many absences at the hospital. The nurse mentioned was engaged by the proponent. After the nurse had been with Mrs. Bucher some three or four weeks she told Dr. Melnik that she was quitting as she had not understood it was a "mental case" when he engaged her.

In connection with proponent's activities surrounding the execution of the will it is of some significance that when Mrs. Bucher died the nurse handed him a card whereon Mrs. Bucher had written that in case of her death she desired Reverend John Harris, the contestant here, to be notified. Instead of notifying him the proponent personally called the attorney who had drafted the will. The testimony given by the attorney is significant. From it the jury could have inferred that the proponent knew much more about Mrs. Bucher's will than his own testimony would indicate. Summarized, the conversation between proponent and the attorney as given by the attorney is this:

"After this will was signed I retained the original of the will and took it to my office. She never saw it again during her lifetime. I did not at that time leave a copy with her. She didn't want a copy while she was in the hospital. She did not express any hatred or feeling against the Reverend John M. Harris at the time I conversed with her. She told me to notify him if anything happened to her. Dr. Melnik

telephoned me at the death; I think it was the day she died or the day after. He said, 'Mrs. Bucher died and the nurse handed me a card—to notify you in the event of her death. What are we supposed to do now?' I said, 'Well, I will notify her uncle by telegram immediately, to make the necessary funeral arrangements.' Then he said, 'Then what do we do?' I said, 'If there are any documents of any kind in her desk, you gather those up, because under the terms of the will, unless she made a new will, you are the executor of the estate.' He said, 'Well, that is nice of her to appoint me executor. After all, I don't know much about these things. Will her family look after her affairs?' I said, 'Well, you happen to be the sole legatee under the will, unless she drew a new will.' He said, 'What?' He says, 'Say that again.' I said, 'You are the sole legatee under her will, unless she drew a new will.' 'Well,' he said, 'that is certainly a surprise to me. She always said she was going to do things for me or surprise me, but I never expected anything like this.' I said, 'That is a fact. Let's get busy now and do whatever is necessary.' "

The proponent denied he had ever seen the copy of the 1934 will. When it was shown that he had written in his own handwriting the name of the attorney he selected, he explained it by saying that when he told Mrs. Bucher the name of the attorney who would come to draw her will he wrote the name for her on the "paper," as she wanted to be sure to remember his name when he called. The jury could infer from this that if the testatrix could not remember the name of the attorney for the space of a few hours her condition was not what it should have been. Moreover, the need for the attorney's name may have seemed unimportant to the jury, as proponent himself introduced the attorney to her when he came.

Prior to her operation in 1936 the decedent had appeared to her close friends to be very healthy. She was accustomed to walk between five and eight miles per day. After the operation she at times had to take the arm of a friend or support herself by furniture in order to move about. She seemed at times to have been unable to walk without assistance and was hesitant in her speech. In July, 1936, she was in a convalescent home. At that time her cousin, Mrs. Marvin (who was not a contestant and who was on the

friendliest terms with decedent), came from Riverside to see
her, for two reasons: (1) because she had been worrying ever
since she saw Mrs. Bucher in August after her operation,
and (2) because neither she nor Mrs. Bucher's relatives in
the east had heard from her by letter, as was her wont, and
all wished to know something about her. Mrs. Marvin hav-
ing gone to Mrs. Bucher's apartment and being unable to
learn her whereabouts, was referred to the proponent by the
apartment house manager. She went to his office and was
informed that he would not tell her where Mrs. Bucher was.
Finally, however, he did tell her, and Mrs. Marvin, with her
daughter-in-law, went to the convalescent home and there
spent an enjoyable afternoon. Mrs. Bucher insisted on their
having dinner with her. In February, 1938, Mrs. Bucher
was again sent to the hospital by the proponent for, as he
testified, high blood pressure and loss of weight. Her sec-
ond stroke occurred on December 4, 1939, and on July 7,
1940, she died from a third stroke.

The decedent's letters to the contestant as late as June 16,
1940, disclosed she was on the most cordial terms with him
and was concerned as to his financial situation, and offered
to assist him by sending him $25 per month for the ensuing
year for a little family genealogical research she suggested
he do. Her attitude towards her husband's nephew is in-
dicated by the fact that over a considerable period of time,
and up to March, 1938, she sent cither to him or his mother
$150 every two months. When she and her husband had been
financially stranded early in their married life this family
took them into their own home for a year. As late as 1937 she
gave some jewelry to her cousin, Mrs. Elmira Marvin, and
the latter's daughter-in-law, Mrs. Eleanor Marvin, living in
Riverside. In 1938 her conduct towards the latter changed
violently. On one occasion in 1938, when Mrs. Bucher called
on her cousin's daughter-in-law, Mrs. Eleanor Marvin, at
an apartment in Los Angeles where the latter was living,
she demanded that Mrs. Eleanor Marvin and her mother-in-
law should not interfere with Dr. Melnik. A witness—the
manager of that apartment house—testified that in her
opinion it was Dr. Melnik (who was pointed out to her from
the witness stand) who brought Mrs. Bucher there, at the
time in question, and then left immediately. The doctor
testified that Mrs. Bucher told him that she disliked her

cousin, Mrs. Marvin. On the other hand, the letters to Mrs. Marvin indicated quite the contrary. The doctor further testified that decedent frequently mentioned matters that showed she was displeased with her family; that on several occasions she told him they were waiting for her money. On the other hand, her letters *after* the execution of the will indicate just the reverse was the situation. From the evidence the jury could have concluded that decedent's change of attitude towards her relatives during the time stated was attributable to the proponent.

While the testimony of the proponent gives an altogether different color to the facts, yet we must view the facts as the jury could have viewed them, and as such they are set forth.

The question as to whether the proponent unduly profited by the will is solved by the terms of the will itself. (*In re Estate of Lances*, 216 Cal. 397 [14 Pac. (2d) 768].) He got thereby the entire estate of the decedent. How large or how little it was we do not know, as the trial court excluded evidence on the point.

The remaining question which the trial court had for consideration on the motion was whether the proponent procured the execution of the will or participated in its execution. In determining that question the trial court was not, on the type of motion before it, entitled to weigh the facts of the case. Instead, its duty was simply to determine whether there was substantial evidence of undue influence. In the consideration of that question the trial judge was required to keep in mind that undue influence can rarely be established by direct proof, and that it is not necessary that it be so established. The rule in that respect is that it may be proved not only by indirect evidence but by proof of facts from which undue influence may be inferred.

Moreover, a contestant in a case such as this is not restricted to the bare facts which he may be able to supply, but he is entitled to the benefit of all inferences which may legitimately be derived by the jury from the facts as established. (28 R. C. L., sec. 97.) Here there was not only evidence from which a jury could infer that the decedent might easily have been imposed upon while in the hospital in her then physical and mental condition, but that a careful groundwork was laid by the proponent for a will, with the

terms of that which was executed. ■ Undue influence which reaches the stage of being undue influence is not at all the same in every case. In one case it takes but little to unduly influence a person; in another case much more. It takes little influence generally in a case where a person is without mentality, intoxicated or under opiates. Accordingly, every case must be viewed in its own particular setting.

■ In viewing the background of the instant case the jury was entitled to consider, as part of its setting, whether it is a usual or normal thing for a person to bequeath one's entire estate to one's personal physician, where one has known the physician for less than two years and where there is no basis for *such* bounty, or *any* bounty, on the part of the physician. Here the physician was paid for his medical services as he rendered them. When we add to that his activities in connection with the will, his contradictory testimony and the condition of the deceased not only when she went to the hospital but while she was there and after her return as well, the jury was not compelled to indulge in speculation or conjecture; it had circumstantial facts from which it was entitled to determine the true facts and to state those facts by its verdict. It did so here, and its verdict should have been upheld.

The judgment is reversed with instructions to enter judgment upon the verdict as rendered.

Moore; P. J., and McComb, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 11, 1942.