274 Cal.App.2d 203 (1969)
Estate of LULIE BOWDEN EVANS, Deceased. RAY C. DANNY DOWLING, Petitioner and Appellant,
v.
JEAN B. NEWMAN et al., Contestants and Respondents.
Civ. No. 33952. 
California Court of Appeals. Second Dist., Div. One. 
June 20, 1969.
 Sam Houston Allen for Petitioner and Appellant.
 Meserve, Mumper & Hughes and Thomas P. Phillips III for Contestants and Respondents.
 LILLIE, J.
 Appellant, unrelated by blood or otherwise to decedent, a widow without children, offered for probate a will executed by her on May 19, 1967; she died later that same day, aged 84 years or thereabouts. Thereunder, save for three bequests of $1.00, appellant was named the sole beneficiary of an estate valued at approximately $40,000. The document was contested on the four statutory grounds (Prob. Code, 371) by her sister, nephews and nieces. The trial court found that while decedent was of sound and disposing mind and the document was executed in the manner and form prescribed by law, decedent's will was made and executed as a direct result of the undue influence exercised by appellant. He appeals from the judgment denying probate; his sole contention is that there was no evidence, either direct or circumstantial, to sustain the finding of overreaching.
 A detailed summary of pertinent facts becomes necessary in light of appellant's claim. He first met decedent before her husband's death which occurred in 1948 or 1949; they were neighbors in Burbank. After Mr. Evans death, decedent moved to Hollywood where she lived for almost 20 years. During her residence in that area, she and appellant were either neighbors or lived in the same apartment building. There was testimony that appellant helped Mrs. Evans financially with small cash contributions, it appearing that she was then dependent on a small income from a voluntary trust established by her late husband's relatives in Philadelphia. Often she would give appellant checks by way of repayment, but these checks were never cashed. There was also testimony that he helped her with shopping and transportation, occasionally taking decedent to the beaches and other resort areas.
 In 1966 appellant married a rather close acquaintance of decedent, the latter being present at the wedding ceremony. Thereafter she was on occasion a guest in appellant's home. It further appears that appellant had a standing order for the delivery of flowers to decedent each weekend. In December of 1966 decedent received some $40,000 to $45,000 in cash from the estate of her deceased husband. She gave appellant a check, blank as to amount, with the request that he fill it in for an amount dictated by his own discretion; this he never *206 did.prior to the receipt of such inheritance, says appellant in his brief, "There is no direct evidence that ... he had any knowledge that she was destined one day to inherit any considerable sum of money, and the circumstances to support such an inference are negligible."
 A friend of appellant, Mr. Laley, testified that he knew the decedent for five years, seeing her three or four times a week. About a year before her death, she told him that "if it hadn't been for Danny, she wouldn't be around to enjoy her inheritance." To another witness for appellant decedent spoke of her friendship with proponent and his kindness to her; in a conversation with the same witness she was also critical of her relatives, stating that on holidays she would "stay in all day and no one would come to see her" except appellant who would bring her "a holiday dinner." About six months before her death, she told Mr. Laley that "she didn't see why, since [Danny] was the only one who helped her, she couldn't do as much for him and she said that she intended to leave whatever she had to him."
 All of the above circumstances, it is urged by appellant, tend to dispel certain of the usual indications of undue influence--that the provisions of the will are unnatural and at variance with the previously expressed intentions of the decedent (Estate of Lingenfelter, 38 Cal.2d 571, 585 [241 P.2d 990]); thus, there is nothing unnatural or unusual when a testatrix gives an old friend a share in her estate (Estate of Darilek, 151 Cal.App.2d 322, 331 [311 P.2d 615]) or leaves her estate to an intimate friend in preference to her relatives whom she seldom saw. (Estate of Bullock, 140 Cal.App.2d 944, 950 [295 P.2d 954, 297 P.2d 633].)
 Somewhat reflecting the other side of the coin, the court made a finding that "decedent's relatives within the second degree ... had shown the decedent kindness and affection during her declining years. ..." Appellant filed objections to this and other proposed findings, but the portion above quoted was allowed to stand. While the evidence adduced on this phase of the litigation was rather meager, certainly it cannot be said that there was any estrangement between the parties involved. Mrs. Mattison, a niece, was in touch with her aunt during the month of January 1967, thanking her for some gifts to the Mattison children. Decedent's sister, Mrs. Newman, testified at greater length concerning their social and other contacts. During her adolescence she and decedent lived with their mother; they came to this country from Newfoundland. *207 Later Mrs. Newman married an engineer and accompanied him to the various cities where he was employed; when in California, she always visited her sister. In 1964 she settled permanently in Newbury Park where decedent was a guest in her home. They would see each other seven or eight times a year, exchanging holiday greetings at Christmas, Easter and on birthdays. On Christmas of 1964, they spent the day together. In 1966 and before decedent's receipt of the money that year from her husband's estate, Mrs. Mattison gave her one hundred dollars to meet the bill, assertedly overdue, of a Philadelphia storage company where her furniture was stored.
 An attorney, Robert Meserve, also testified for the respondents. He first met decedent in 1948 or 1949 at the time of her husband's death. Subsequently his law firm probated her husband's estate; in the years following, income tax services were performed for decedent. In 1966 the Meserve law firm was in the process of closing out the second probate of her husband's estate which had to be reopened because of additional assets. In October of that year decedent was in contact with Meserve, as well as the Philadelphia trust company, to the effect that she had not been receiving her regular checks. It was established by Meserve that such payments had been regularly forthcoming, copies of checks received and indorsed by decedent having been sent to Meserve. In January of 1967, after the distribution to decedent of the lump sum remaining in her husband's estate, Meserve received a call from the local telephone company regarding decedent's bill overdue for many months. When he contacted decedent, she admitted the bill's delinquency; she claimed that she did not have any money to pay it, although he reminded her that she then had ample funds to satisfy such obligation. Meserve further testified that before the balance of her husband's estate was finally distributed to her, the income from the Philadelphia trust was approximately $350 each month.
 At the request of eastern relatives (apparently of her deceased husband), and shortly after the conversation about the delinquent phone bill, Meserve contacted the decedent about the investment of her cash, mentioning the possibility of a withdrawal account in some mutual fund. The investment plan was discussed with an officer of the Bank of America whom decedent knew. Although she told those concerned to proceed with the plan, she later advised Meserve that she did *208 not want to sign the papers after arrangements had been made with the broker and after certain securities had been ordered. At or about this time, according to Mrs. Newman, it was also suggested by Meserve that Mrs. Newman apply for letters of guardianship; decedent told her sister that she thought she could manage her own business, and nothing further was ever done in that regard. Subsequently, on March 10, 1967, Meserve wrote decedent and proposed the preparation of a will; to such communication she did not respond.
 On either April 26 or 27, decedent's family doctor, Dr. Huffman, was called to her apartment where he found her lying on the floor; she was propped up against an overturned stool. After giving her a stimulant, he suggested that her relatives be called. Mrs. Newman then took decedent to her Newbury Park home where she remained overnight. The next day Mrs. Newman brought her sister back to the latter's apartment; she remained with her that night and the night following. At an early morning hour, hearing a thud, Mrs. Newman went into decedent's room and found that the latter had fallen onto the floor. Upon Dr. Huffman's order, decedent was admitted to a Los Angeles hospital later that morning (April 30).
 On the date of decedent's admission, the following patient's "History" pertinent here was signed by Dr. Huffman for inclusion in the hospital records: "Unable to give history. Remarks are not pertinent or responsive. Memory defect. Found on the floor fully clothed and sleeping. Seemed lethargic when awakened. ... Neighbors say she has been acting peculiarly for several months. Will let no one into her apt. friends or relatives." His "Progress Notes" for the same day (April 30) stated that for at least two days decedent had been disoriented more or less, that she ate but little and that malnutrition was obvious. On May 3 Dr. Paul Northrup, specializing in neurological surgery, was asked by Dr. Huffman to examine decedent. Several neurological studies on May 8 disclosed that decedent was alert but confused--she thought that she was in La Jolla and did not realize she was in the hospital. In Dr. Northrup's opinion, decedent was suffering from cerebral arteriosclerosis which was unlikely to change materially, one way or the other, in the immediate future, and that she was not competent to transact any business at all. Dr. Huffman also stated that decedent was "incompetent," and at the time of her death she was senile. It was his further opinion that decedent could not have read *209 and understood the document here in question, nor would she have been able to comprehend the same instrument in its entirety had it been read to her--decedent could not focus her attention for the length of time such a reading would require, adding that he himself could not get her to focus her attention for more than a few seconds to a minute.
 [1] The foregoing evidence is not summarized by way of criticism of the finding on the issue of decedent's competency favorable to appellant; however, any evidence tending to show impaired mentality is relevant insofar as it may show susceptibility to undue influence. As rather recently stated: "Another factor which has been considered in support of a finding of undue influence is the existence of a mental and physical condition permitting subversion of the decedent's freedom of will. [Citations.]" (Estate of Garibaldi, 57 Cal.2d 108, 113 [17 Cal.Rptr. 623, 367 P.2d 39].)
 Appellant, upon learning of decedent's presence in the hospital, visited her there each day; there was evidence that he arranged to have her moved from a "ward" containing multiple beds to more private accommodations, offering to pay the added expense incident thereto. Decedent was also visited by Mr. Meserve prepared guardianship papers which included a Mrs. Newman. On May 16, presumably at the behest of decedent's sister whose last visit to the hospital was on May 15, petition for the appointment of Mrs. Newman as guardian. These he took to the hospital where he talked to decedent for about 15 minutes, explaining the substance of the various documents. According to Meserve, he was able to secure no response from her, nor did she give any indication that she wanted to accept the papers. Apparently they were left there by Meserve, since appellant testified that he saw certain guardianship papers in decedent's room on a visit occurring about that date. Appellant also testified that on May 17 decedent asked him to secure an attorney for her to draw up a will; although he knew Meserve was her attorney, he admittedly made no effort to contact him. According to appellant, when decedent received the second guardianship proposal, "it infuriated her" and she told him "she wanted [him] to be the guardian and have a will and power of attorney and asked [him] to get the necessary papers," repeating such request two or three times thereafter.
 It is undisputed that appellant brought the petition for guardianship letters prepared by Meserve home to his wife who took the document the following day to her place of *210 employment. She testified that she was too busy that morning to type up a will, so she requested another secretary, Mrs. Noto, to type up a power of attorney, a petition for appointment of appellant as guardian for decedent and a will. All three instruments were subsequently typed by Mrs. Noto who had no legal training and stated that she made use of a Wolcott form for the document captioned "Last Will and Testament." The above notwithstanding, curiously enough, Mrs. Noto answered in the negative to the question: "Now, did anybody tell you to put in this language, and I quote: 'In view of the fact that my relatives within the second degree within and without the State of California have never shown any kindness to me during my declining years and have neglected me in every way, I hereby do give and bequeath to them each the sum of one dollar'?"
 The next afternoon (May 19), at about 1 o'clock, appellant took the three documents prepared by Mrs. Noto to decedent's hospital room. According to appellant, he talked to decedent alone for about an hour or so; he read all three documents to her in their entirety. Decedent herself then read the guardianship petition, observing, "Well, this is the same as the one that was served on me." She next read the will and the power of attorney. After she had completely read the will, she asked appellant, "Do you have any witnesses?" and he replied: "I hope to have." A nurse's aide, Mrs. Roberts, and another employee of the hospital, one Minton, subsequently witnessed the execution of the will; during its execution appellant remained in the room. Mrs. Roberts testified that on that afternoon decedent was hooked up to an I.V. apparatus, and to prevent the pulling of the I.V. tube out of her arm, there were restraints which tied both arms to the side rails of her bed. The restraint on the right arm was not released until just before she signed the three documents. This, as well as other circumstances hereinabove referred to, may explain the presence of her signature on the petition for appointment of a guardian at the place reserved for the date thereof; too, such other circumstances will also explain why that document called for her signature in the first instance since appellant was the party seeking letters of guardianship. [fn. 1] *211
 After the documents were signed, appellant put them in his brief case and took them home. About five hours later, at approximately 7:30 p.m., decedent died; the immediate cause of death was stated to be bronchial pneumonia due to malnutrition.
 [2] "The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case." (Estate of Bristol, 23 Cal.2d 221, 223 [143 P.2d 689].) [3] Further, in reviewing the evidence all conflicts are resolved in favor of the prevailing party below and all legitimate and reasonable inferences are indulged in to uphold the finding of the trier of fact. (Estate of Lauth, 180 Cal.App.2d 313, 317 [4 Cal.Rptr. 764].) As stated at the outset, appellant contends that the evidence is insufficient to support the finding that the will was procured by undue influence on his part. The legal principles to be used in determining whether a will is the product of undue influence have been stated many times. [4a] " 'The rule is firmly established in California that when the contestant has shown that the proponent of a will sustains a confidential relationship toward the testator, and actively participates in procuring the execution of the will, and unduly profits thereby, the burden then shifts to the proponent to prove that the will was not induced by his undue influence. [Citations.]' " (Estate of Pellegrini, 138 Cal.App.2d 143, 145 [291 P.2d 558].) [5] There must be a concurrence of all the foregoing factors, none of which standing alone has the effect of creating a presumption against the document's invalidity (Estate of Llewellyn, 83 Cal.App.2d 534, 562 [189 P.2d 822, 191 P.2d 419]); but upon proof sufficient to establish such concurrence, it is for the trier of fact to decide whether the presumption of undue influence thus arising has been overcome. (Estate of White, 128 Cal.App.2d 659, 669 [276 P.2d 11].) Appellant concedes the existence of a confidential relationship, declaring in his opening brief (p. 3) that he "enjoyed the implicit trust and confidence of the decedent ... [which] grew out of a friendship ... developed over a period of some 28 years." [6] No concession is made, however, as to the second element or factor, activity in the will's procurement; appellant contends that the only evidence as to any activity surrounding the actual signing of the instrument was given by the subscribing witnesses and himself. It is difficult to follow this argument in light of our recital of the critical events. Appellant obtained and brought the fully prepared *212 document to decedent's hospital room, read it to her, remained there while she herself subsequently read it, and continued to remain in the room during its attestation by the two witnesses. In our view, the foregoing circumstances are far different from activities of an "incidental" nature mentioned in Estate of Fritschi, 60 Cal.2d 367, 374-376 [33 Cal.Rptr. 264, 384 P.2d 656], and the cases therein cited. True, it has been held that the mere physical presence of the beneficiary at the execution of the will is insufficient to show activity and the procurement of a witness or of an attorney to draw the will does not necessarily constitute active participation (Estate of Straisinger, 247 Cal.App.2d 574, 586 [55 Cal.Rptr. 750]), but unlike the situation in Straisinger, appellant took the guardianship petition prepared by Meserve to his home, although he admitted that decedent told him at the hospital to secure an attorney to draw up a will. The inference is reasonable that this was simply step one in appellant's plan to acquire decedent's estate practically in its entirety. Subsequent steps in such plan are reflected in the will and power of attorney prepared by appellant's agents, his wife and Mrs. Noto. Mrs. Noto denied that anyone told her to insert the language in that clause of the will cutting off decedent's sister with a bequest of $1.00, but the record reveals that appellant's wife subsequently testified that "except the things she got out of her guide, this Wolcott's guide" she told Mrs. Noto what to put in the will. Much of the above is, of course, circumstantial; but, as recently pointed out, "In this case, as in most others in which the issue of undue influence is raised, direct evidence cannot be produced." (Estate of Goetz, 253 Cal.App.2d 107, 115 [61 Cal.Rptr. 181].)
 Appellant's next claim is that there was no showing of the third element or factor--that he unduly profited by the instrument he offered for probate. He emphasizes the striking by the trial court, upon his objection thereto, of the proposed finding "That said purported will is unnatural; that it does not make provision for decedent's blood relatives." The action of the trial court was correct in view of the settled rule that collateral heirs such as sisters, brothers and their descendants "are not, because of such relationship alone, natural or normal objects of bounty. [Citations.]" (Estate of Nolan, 25 Cal.App.2d 738, 742 [78 P.2d 456].) While appellant did not object to the further proposed finding that he "would unduly profit from said purported will if it were admitted to probate," he now contends that this latter finding is in irreconcilable conflict with that which was stricken. *213
 Appellant argues that undue profiting under a will must be equated with the document's unnaturalness. In at least one case, with reference to "persuasive evidence of undue influence," the two terms are used conjunctively: "Where it appears, in addition to such [confidential] relationship, that the will is unnatural and would result in undue profit to a proponent and that he was active in procuring its execution, there is persuasive evidence of undue influence. [Citations.]" (Estate of Garibaldi, supra, 57 Cal.2d 108, 113.) There is a similar statement in Estate of Teel, 25 Cal.2d 520, 528 [154 P.2d 384]: "A fiduciary relationship exists between husband and wife in respect to the issue of undue influence in a will contest, and where such fiduciary relationship is combined with unduly profiting by the will, and its being unnatural, and activity on the part of the proponent in procuring its execution, we have persuasive evidence of undue influence." (Italics added.) In Estate of Abert, 91 Cal.App.2d 50 [204 P.2d 347], after quoting from Teel, as above, the same argument seemingly made here was thus disposed of: "We are persuaded the Supreme Court did not intend by the inclusion of an unnatural will in its recitation of facts in that case to hold that the foregoing rule [shifting the burden of proof to the proponent], so frequently announced in our authorities, was thereby enlarged to also require proof that the will is unnatural before the burden shifts so as to require the proponent to affirmatively prove that the will is not the product of his undue influence. All that the court said in the Teel case, in that respect, is that when proof of the four named elements appears there is persuasive evidence of undue influence." (Pp. 58-59.)
 Likewise, in Estate of Bucher, 56 Cal.App.2d 135 [132 P.2d 257], it was contended that the trial court committed reversible error in failing to give in its entirety the following instruction: " 'A confidential relationship, such as may exist between physician and patient, is not sufficient to raise any presumption of undue influence. There must in addition be proof (a) of activity in the preparation of the will, (b) to his undue profit, meaning that there must be proof that the will is unnatural."
 " 'A collateral heir (and the contestant here is a collateral heir) if omitted from a will, in order to show that the instrument is unnatural, must show affirmatively that he had a peculiar or superior claim to the decedent's bounty, and if no *214 such claim is adduced the instrument cannot be held to be unnatural.'"
 "Appellant requested the court to give the whole of the above quoted instruction. Instead, the court gave only a portion thereof, striking out the parts which appear above in italics and giving only the remainder." (P. 137.) The opinion makes mention of the trial court's elaboration to the jury upon the question of "the natural object" of a testator's bounty. It appearing that the contestant there was a half-brother of decedent's mother, the jury was told that "in no sense [was he], legally or morally, the natural object of Mrs. Bucher's bounty."prior thereto, the jury was told that "the law recognizes a certain class of relationship to a deceased person as creating what is called 'a natural object of bounty.' " This rule places descendants (such as children), the surviving spouse (widow or widower), and the parents, in such a class or category; excluded from such category are nephews and nieces, sisters and brothers. Finally, the trial court thus expounded the applicable law: "Because a person, contestant or otherwise, is an heir at law of a testatrix, this does not make him the natural object of a testatrix's bounty." (P. 138.) Citing two California cases, Estate of Lances, 216 Cal. 397 [14 P.2d 768], and Estate of Bucher, 48 Cal.App.2d 465 [120 P.2d 44] (an earlier appeal involving the same parties), the appellate court concluded that those portions of the instructions, above italicized, were properly stricken, further determining that there could be undue profiting even if the heirs excluded by virtue of testacy were not the natural objects of the testatrix's bounty. "As said in the Lances case, in which testator's attorney was the sole beneficiary: 'There is ... an uncontradicted showing that he unduly profited by the terms of the will; he was to receive the whole of the estate, representing a very substantial amount and to the prejudice of the heirs of decedent.' (Italics added.) And in the Bucher case: 'The question as to whether the proponent unduly profited by the will is solved by the terms of the will itself. [Citing a case.] He got thereby the entire estate. ...' " (56 Cal.App.2d at p. 139.) In accord is Estate of Trefren, 86 Cal.App.2d 139 [194 P.2d 574]; as stated therein, "If there had been no will respondent[s] would have received all of said property [Prob. Code, 225] and appellant none. Under such circumstances we do not believe that it can be held that there is no evidence in the record from which a jury would be justified in concluding *215 that appellant ... unduly profited by the will." (P. 149.) We cannot accept appellant's suggested distinction between the case here and the situation in Lances (where the proponent was an attorney) and in Bucher (where he was the decedent's physician); appellant admits the existence of a confidential relationship, and we cannot follow his suggestions that there can be varying qualitative degrees thereof. [7] "Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another." (Estate of Cover, 188 Cal. 133, 143 [204 P. 583].)
 In summary, in Estate of Graves, 202 Cal. 258 [259 P. 935], the decedent left her entire estate save $100 to one Black, a real estate agent; when the will was contested (after probate) by her niece and sole heir, it was contended by the proponent, among other things, that because of the kindnesses shown by him to decedent, he was the natural object of her bounty. Although a jury found in proponent's favor on the issue of testamentary capacity, it reached the further conclusion that the will was procured by proponent's undue influence. The Supreme court affirmed the judgment revoking probate. "Appellant correctly contends that mere proof of opportunity to influence the mind of the testatrix, even though shown to be coupled with interest, or a motive to do so, does not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly on her testamentary act. [Citation.] But in this case it clearly appears that the appellant took an active part in securing the execution of the will at a time when there existed a confidential relation between himself and Mrs. Graves. The rule is well settled that ' "Where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the will was not included by coercion or fraud" [citations], and that "a presumption of undue influence arises from proof of the existence of a confidential relation between the testator and such a beneficiary, coupled with activity on the part of the latter in the preparation of the will." [Citation.]' (Estate of Relph, 192 Cal. 451, 465 [221 Pac. 361].) Appellant did not sustain the burden cast upon him in the lower court, and has not satisfied us that the finding of the jury, and the consequent judgment revoking the will, are incorrect as matters of law." (Pp. 262-263.) *216
 As his final point, appellant makes the novel contention that by the enactment of certain sections of the Evidence Code relative to presumptions ( 601, 603, 605), the great body of decisional law heretofore governing the problems above discussed should be re-examined and, perhaps, no longer adhered to. It is argued (very briefly) that section 605 limits the shifting of the burden of proof to those presumptions which rest upon some public policy, adding that if such policy favors the distribution of estates there would seem to be no reason why such policy would favor one recipient over another where both stand on an equal footing with respect to their claims to the decedent's bounty. [8] But as a matter of public policy the law also does not favor one who entertains a confidential relationship with another to take advantage of that relationship and unduly profit thereby. [4b] The cases uniformly hold that where there is a concurrence of the several elements repeatedly referred to above, the burden of proof rests with the proponent to overcome the presumption; indeed, section 606 expressly declares that "The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." Appellant further states that sections 601 and 603, assuming a presumption is supported, shift only the burden of producing evidence; in the instant case, he asserts, he has met that burden by credible evidence neither impeached nor contradicted. We see nothing in the present record which supports such an extravagant claim in its entirety, the question of credibility (for example) being primarily one for the trier of fact.
 The judgment (denying probate) is affirmed.
 Wood, P. J., and Thompson, J., concurred.
NOTES
[fn. 1] 1. The closing language of the petition is as follows: "She has specifically requested that I, Ray C. Danny Dowling, be appointed the guardian of her person and estate." Continuing, "Wherefore, petitioner prays that he or some other suitable person be appointed guardian of the person and estate of Lulie Bowden Evans."