36 Cal.App.3d 854 (1974)
111 Cal. Rptr. 833
Estate of ROSA BALASSI GELONESE, Deceased.
ROBERT BALASSI et al., Petitioners and Appellants,
v.
CHARLES BALASSI, Contestant and Respondent.
Docket No. 32239.
Court of Appeals of California, First District, Division One.
January 23, 1974.
*857 COUNSEL
Rawles, Golden, Hinkle & Finnegan and Richard C. Burton for Petitioners and Appellants.
Leo M. Cook for Contestant and Respondent.
OPINION
MOLINARI, P.J.
Robert Balassi, Lena Balassi Paolinelli and Peter Balassi (hereinafter referred to by their given names) appeal from a judgment upon a jury verdict denying probate of an instrument dated June 15, 1966, and asserted to be the last will and testament of Rosa Balassi Gelonese (hereinafter referred to as the "decedent").
Robert, Lena and Peter are children of decedent. The subject instrument purported to name Robert as the executor thereof and left certain property to Robert, Lena and Peter in equal shares and left $100 each to her two remaining children, Rosie Balassi Del Grosso and Charles Balassi (hereinafter also referred to by their given names). When this instrument was offered for probate as decedent's last will, Charles filed a contest of will before probate alleging that the proffered will was procured by undue influence, fraud and duress. No challenge was made to the execution of the instrument or the testamentary capacity of decedent.
*858 At the trial of the will contest the ground of alleged duress was abandoned, and the contest proceeded on the grounds of undue influence and fraud. The jury returned a unanimous special verdict that the execution of the alleged will was obtained through the undue influence of Lena and Robert.
The facts adduced at the trial are as follows: Decedent was born in Italy and immigrated to the United States prior to 1915. She married one Balassi and the litigants in this action are children by that marriage. Balassi died in 1935. Decedent then married Russell MacMillan. This union resulted in a divorce 10 or 12 years later. In 1950 decedent married Antonio Gelonese.
During her first two marriages decedent lived on a farm outside of Fort Bragg and during part of the second marriage Charles and his family also lived on the farm. Upon her marriage to Gelonese decedent moved into Fort Bragg where she lived in an upstairs apartment. Charles moved into the downstairs apartment until he purchased his own home a year or two later.
In 1960 decedent executed a will and a codicil;[1] in 1961 she executed another codicil;[2] and in 1964 she executed another will.[3] On April 8, 1966, Gelonese died. Shortly after his death decedent fell ill either as the result of a stroke or heart failure. She was hospitalized for four or five days, and when she returned home she was cared for by Rosie and Lena. A short time later she was again hospitalized with a stroke and remained hospitalized until May 12, 1966. When she returned home she was cared for by Lena, Robert and Robert's wife until her death in September 1971.
Shortly after Gelonese's death decedent consulted Thomas C. Lonergan, an attorney at law in Fort Bragg, who prepared a will for her. This will disposed of her estate essentially the same as the will offered for probate in the instant proceedings. On or about May 26, 1966, Robert Petersen, Lonergan's law partner, went to decedent's house for the purpose of executing the will prepared by Lonergan. Petersen was accompanied by *859 a Catholic priest and a doctor, both of whom had been summoned at Lonergan's suggestion. Petersen, in the presence of the priest, the doctor, Peter and Lena, interrogated decedent and determined that she did not possess testamentary capacity at that time. Accordingly, the will was not executed.
Thereafter, decedent went to the office of Angelo Penitenti, a local real estate broker, for the purpose of having Penitenti translate the will prepared by Lonergan from English into Italian. Decedent asked Penitenti to make certain changes for her and to retype the will. When Penitenti advised decedent that the will was ready for execution, decedent, accompanied by Lena, visited Dr. Gordon Havstad, her regular physician, for a physical examination. At either Lena's or decedent's request Dr. Havstad prepared a certificate of competency. Decedent then went to Penitenti's office with Robert. Lena, upon being called, also went to Penitenti's office. Daniel Cervelli, who had previously been asked by Robert if he would be a witness to decedent's will, and Frank Lucchesi, who had been previously directed to decedent by Lena and asked to be a witness to the will by decedent, went to Penitenti's office after being notified to do so.
When decedent arrived at Penitenti's office she and Penitenti retired to his private office to discuss the will. They then returned to the anteroom where Robert, Lena and the two witnesses were waiting. After a short discussion, Penitenti, decedent and the two witnesses went into Penitenti's private office where the will was executed. With respect to this occurrence, one Kostick testified that Lucchesi, one of the witnesses to the will, had stated to him that "... it was kind of a funny set up.... The old lady was making out the will and the other two [Robert and Lena] were doing all the talking."
Other evidence was adduced at the trial with respect to Gelonese's will which left his trailer court in Fort Bragg to the children of Charles and his wife subject to a life estate in decedent and in Charles and his wife. This devise was challenged by decedent in an heirship proceeding wherein she claimed that the trailer court was community property and therefore not entirely subject to the disposition in the will. Charles resisted this claim and was successful in defeating it. There was testimony that as a result of this litigation and other incidents decedent was angry with Charles, his wife, and Rosie, although other evidence was adduced that decedent had stated she was happy that Charles and his children were going to get the trailer court because that was the way her husband wanted it.
Robert Heeb, an attorney who represented decedent in the heirship proceeding, testified that a few months after Gelonese's death decedent came *860 to his office and asked him to prepare a transfer of her real property to all of her children excepting Charles because she felt Charles had gotten his share from her late husband; that he prepared an instrument transferring all her real property to Peter, Robert, and Lena in equal shares, reserving a life estate in herself; and that decedent had told him Charles had not been kind to her.
Rosie and Charles both testified that after decedent's return from the hospital the second time they were prevented from visiting her; that when they succeeded in visiting her they were harassed; that decedent's telephone was disconnected; and that decedent was kept a virtual prisoner by Robert and Lena. Charles testified that his mother told him, "Oh, I feel fine. I eat and sleep and I am in prison," and that Peter called him and told him he could not come over any more or he would be left out of the will. These claims were denied and directly contradicted by Robert, Lena, and Peter.
According to Charles and Rosie, decedent had made the following statements prior to Gelonese's death: That she was only going to leave Robert one dollar because she was mad at him because of a timber deal; that the ranch would go to all of her children; that Peter would get the last remaining parcel; that Rosie would get $6,000 in cash instead of part of the ranch; that Lena had enough money of her own; that decedent wanted to leave her grandchildren a thousand dollars apiece; and that she wanted to make everybody equal.
There was also testimony that prior to Gelonese's death, Rosie and Charles visited decedent at least two times a week, and that Lena and Robert rarely visited decedent.
Lena testified that she visited decedent three or four times a month or more prior to Gelonese's death. Robert testified that he saw decedent more often after Gelonese died.
Robert testified that he did not stop anybody from coming to see decedent, and that he did not cheat his mother on the timber deal. There was testimony that decedent and Charles had a discussion, and Charles said he was not going to come back any more. According to Robert's wife Lola, Charles had said that he was boss, and if he could not be boss he was leaving and never coming back. The making of such a statement was denied by both Charles and Rosie.
Robert testified that in April or May 1966 decedent had stated that Charles had too much and that she was not going to leave him anything, and that decedent stated that Rosie had betrayed the children.
Lonergan testified that he discussed each of the provisions of the unexecuted *861 will of May 1966 with decedent, and Penitenti testified that on two occasions he discussed with decedent the provisions of the will offered for probate.
Evidence was also adduced that Charles sued Lena, Robert and decedent for alleged waste committed on his life estate interest in the trailer park.
A letter bearing date of June 16, 1966, purportedly written by decedent in Italian was admitted into evidence. This letter stated an intent identical with that expressed in the will offered for probate and explained the reasons for the disposition. This letter was signed "Rosi Balasi." Rosie testified that her mother never signed her given name as "Rosi" and that she always wrote Balassi with two "s"s. Charles testified that decedent always spelled Balassi with two "s"s. Robert, in turn, produced a check on which decedent had signed Balassi with one "s."
Appellants contend that the judgment must be reversed for two reasons: (1) the evidence was insufficient to establish the presumption of undue influence, and even if it was sufficient they overcame the presumption, and (2) the evidence without the presumption was insufficient to support a finding of undue influence.
(1) Before proceeding to consider the merits of these contentions, we deem it expedient to call to mind that in reviewing the sufficiency of the evidence, certain well-established principles defining our scope of review are applicable. These are: (1) all conflicts must be resolved for the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict where possible; (2) the appellate court's power begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the jury's conclusion; and (3) when two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (Florez v. Groom Development Co., 53 Cal.2d 347, 354 [1 Cal. Rptr. 840, 348 P.2d 200]; Estate of Teel, 25 Cal.2d 520, 526 [154 P.2d 384]; Crawford v. Southern Pacific Co., 3 Cal.2d 427, 429 [45 P.2d 183]; Fibreboard Paper Products Corp. v. East Bay Union of Machinists, 227 Cal. App.2d 675, 696 [39 Cal. Rptr. 64].)
The jury in the instant case found, upon a special verdict, that the execution of the alleged will dated June 15, 1966, was not obtained through the fraud of Lena and Robert but found that it was obtained through their undue influence. (2) In this state a presumption of undue influence arises when there is a concurrence of the following elements: "(1) the existence of a confidential or fiduciary relationship between the testator *862 and the person alleged to have exerted undue influence; (2) active participation by such person in preparation or execution of the will; and (3) an undue benefit to such person or another person under the will thus procured." (Estate of Kerner, 275 Cal. App.2d 785, 788 [80 Cal. Rptr. 289]; Estate of Fritschi, 60 Cal.2d 367, 376 [33 Cal. Rptr. 264, 384 P.2d 656].) All three of these factors must be present in order to have the benefit of the presumption. (Estate of Fritschi, supra; Estate of Kerner, supra.)
We observe here that two provisions of the Evidence Code[4] came into play, insofar as the contestants are concerned. These are sections 550 and 600. Subdivision (a) of section 600, in pertinent part, provides: "A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action...."; and section 550 reads as follows: "(a) The burden of producing evidence as to a particular fact is on the party against whom a finding on that fact would be required in the absence of further evidence. (b) The burden of producing evidence as to a particular fact is initially on the party with the burden of proof as to that fact." Accordingly, since the contestants alleged in their petition contesting the will that the proponents obtained its execution through undue influence, the burden of proving that allegation rested upon them. This burden would initially be satisfied if they were able to prove the three elements alluded to above, since upon proof of all of these elements the assumed fact, i.e., the presumption of undue influence, would be established. This burden of proof required proof by a preponderance of the evidence. (§ 115.)
The presumption of undue influence, when established, is a rebuttable presumption. (Estate of Lingenfelter, 38 Cal.2d 571, 585 [241 P.2d 990]; Estate of Peters, 9 Cal. App.3d 916, 922 [88 Cal. Rptr. 576]; Estate of Evans, 274 Cal. App.2d 203, 211 [79 Cal. Rptr. 1]; see §§ 600, 601, 620.) We apprehend it to be a presumption affecting the burden of proof since it is established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied. (§§ 601, 603; Rebmann v. Major, 5 Cal. App.3d 684, 688 [85 Cal. Rptr. 399].) Section 605 alludes to the public policy in favor of "... the security of those who entrust themselves or their property to the administrations of others" as being a public policy which a presumption affecting the burden of proof seeks to implement. In cases decided prior to the adoption of the Evidence Code on January 1, 1967, the presumption of undue influence arising where a fiduciary or confidential relationship existed was deemed to be one affecting the burden of proof. (Trafton v. Youngblood, *863 69 Cal.2d 17, 28 [69 Cal. Rptr. 568, 442 P.2d 648]; Estate of Witt, 198 Cal. 407, 419 [245 P. 197]; Rebmann v. Major, supra; McDonald v. Hewlett, 102 Cal. App.2d 680, 687 [228 P.2d 83, 24 A.L.R.2d 1281]; see Stevens v. Marco, 147 Cal. App.2d 357, 383 [305 P.2d 669]; but see Estate of Eakle, 33 Cal. App.2d 379, 382 [91 P.2d 954].)
"The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (§ 606.) (3) Accordingly, when the contestant has shown by a preponderance of the evidence that the proponent of a will sustained a confidential relationship toward the testator, actively participated in procuring the execution of the will, and unduly profited thereby, a presumption of undue influence, i.e., the presumed fact, arises, and the burden then shifts to the proponent to prove that the will was not induced by his undue influence. (Estate of Evans, supra, 274 Cal. App.2d 203, 211; Estate of Pellegrini, 138 Cal. App.2d 143, 145 [291 P.2d 558].) This burden requires that the proponent produce proof by a preponderance of the evidence that the will was not induced by his undue influence. (§ 115; see Sierra Nat. Bank v. Brown, 18 Cal. App.3d 98, 105-106 [95 Cal. Rptr. 742].)
(4) The question whether the evidence adduced by a party who has the burden of proof carries the required weight is for the trier of fact and not the court of review. (Baron v. Baron, 9 Cal. App.3d 933, 939 [88 Cal. Rptr. 404]; Rebmann v. Major, supra, 5 Cal. App.3d 684, 687; see Develop-Amatic Engineering v. Republic Mortgage Co., 12 Cal. App.3d 143, 149 [91 Cal. Rptr. 193]; Munger v. Moore, 11 Cal. App.3d 1, 10 [89 Cal. Rptr. 323].) "On appeal the question is governed by the substantial evidence rule like any other issue of fact." (Cavanaugh v. High, 182 Cal. App.2d 714, 718 [6 Cal. Rptr. 525]; Beeler v. American Trust Co., 24 Cal.2d 1, 7 [147 P.2d 583]; Develop-Amatic Engineering v. Republic Mortgage Co., supra; Munger v. Moore, supra.)
(5) We advert to the three elements necessary to bring the presumption of undue influence into play. With respect to the first element, i.e., the existence of a fiduciary or confidential relationship is present as a matter of law. Such a relation is presumed to exist between parent and child. (Robins v. Hope, 57 Cal. 493, 497 [overruled on other grounds, Seeger v. Odell, 18 Cal.2d 409, 416 (115 P.2d 977, 136 A.L.R. 1291)]; Estate of Eakle, supra, 33 Cal. App.2d 379, 388; Bacon v. Soule, 19 Cal. App. 428, 434 [126 P. 384]; Hemenway v. Abbott, 8 Cal. App. 450, 463 [97 P. 190]; see Estate of Garibaldi, 57 Cal.2d 108, 109-112, 113 [17 Cal. Rptr. 623, 367 P.2d 39].)
*864 We are not unmindful that there is authority that "Consanguinity of itself does not create a fiduciary relationship." (Estate of Lingenfelter, supra, 38 Cal.2d 571, 585; Estate of Welch, 43 Cal.2d 173, 178 [272 P.2d 512]; Estate of Jamison, 41 Cal.2d 1, 10 [256 P.2d 984]; Estate of Llewellyn, 83 Cal. App.2d 534, 562 [189 P.2d 822, 191 P.2d 419].) Of these cases only Jamison involved a parent and child relationship. In Lingenfelter the relationship was that of a sister-in-law; in Welch it was that of a brother, and in Llewellyn it was also that of a brother. Lingenfelter and Welch rely upon Llewellyn as authority for the statement that "Consanguinity of itself does not create a fiduciary relationship." (Lingenfelter, at p. 585; Welch, at p. 178.) Jamison, in turn, relies upon Lingenfelter. (41 Cal.2d at p. 10.) However, Llewellyn was specifically dealing with the relationship existing between brothers and in terms of that relationship when it states: "While asserting, and we think correctly, that blood relationship is an important and material circumstance in considering the question whether in fact, a confidential relationship exists, respondents concede that the relationship existing as here, between brothers, is not in itself a fiduciary relationship. [Citation.]" (83 Cal. App.2d at p. 562.)
We observe that Jamison cites Robins, Eakle and Soule as cases holding that the relationship of parent and child is a fiduciary relationship. (41 Cal.2d at p. 10.) Jamison does not disapprove of these cases, but resolves the issue before it on the basis that the father and son relationship and the other evidence adduced warranted the inference that a confidential relationship existed. (41 Cal.2d at p. 10.) We observe, too, that in Garibaldi, where Jamison is cited as authority for the proposition that a fiduciary relationship combined with an unnatural will that would result in undue profit to a proponent who was active in procuring its execution, affords persuasive evidence of undue influence, the Supreme Court states with respect to the relationship of parent and child there present: "It is undisputed that a confidential relationship existed between decedent and proponents." (57 Cal.2d at p. 113.)
Appellants' strong reliance on Broaddus v. James, 13 Cal. App. 464 [110 P. 158] is misplaced. That case does not hold, as is contended by appellants, that a parent-child relationship does not create a confidential relationship. In that case the action was one to set aside a deed made by an aged widow to her surviving daughter to the exclusion of children of a deceased daughter. The reviewing court held that "The mere relation of parent and child is not sufficient to invalidate a deed from the former to the latter." (At p. 472.) The appellate court went on to state that something more than this relation was necessary to defeat the conveyance such as imposition, fraud, importunity, duress or something of that nature. (At pp. 472-473.) *865 Similarly, in the instant case, where we are concerned with a will, the existence of a confidential relation arising out of the parent-child relationship is not enough to invalidate the will but there must also be a showing of undue profit to a proponent and active participation by him in procuring its execution.
Our own research discloses the cases of McMurray v. Sivertsen, 28 Cal. App.2d 541 [83 P.2d 48], which makes the broad statement that "The mere existence of the relationship of parent and child did not alone give rise to a fiduciary relation." (At p. 547.) McMurray cites Broaddus and Smith v. Mason, 122 Cal. 426 [55 P. 143], and Best v. Paul, 101 Cal. App. 497 [281 P. 1089] as authorities for this proposition. As already pointed out, Broaddus does not support this statement; neither does Smith. In Smith the court merely held that the fact that a deed was made from father to daughter and the alleged fact that it was without consideration, do not in and of themselves raise a presumption of fraud or raise a resulting trust in favor of the other children of the grantor. (At p. 427.) Best is to the same effect. (At p. 499.)
Assuming, arguendo, that the relationship of parent and child is, as suggested in Jamison, "some evidence of a fiduciary relationship" (41 Cal.2d at p. 10), there are other circumstances which, when taken together with that relationship, warrant an inference that a confidential relationship existed between decedent and Robert and Lena. These are the circumstances showing the close relationship between them. Following her last hospitalization on May 12, 1966, and until her death, decedent was cared for by Lena, Robert and Robert's wife. There was ample evidence that decedent discussed her business affairs, including the dispositions to be made under her will, with Robert and Lena. Moreover, as will be next discussed, both Robert and Lena actively participated in the execution of the will offered for probate. (See Estate of Jamison, supra, 41 Cal.2d 1, 10.)
(6) Directing our attention to the second element, i.e., whether the proponents, or any of them, actively participated in the preparation of the will, we note that such activity may be established by inference, that is, by circumstantial evidence. (Estate of Garibaldi, supra, 57 Cal.2d 108, 113; Estate of Jamison, supra, 41 Cal.2d 1, 8.) Such an inference could be drawn from substantial evidence adduced for the jury's consideration as follows: At the time of the execution of the subject will and until her death decedent was being cared for by Lena and by Robert and his wife. Rosie and Charles had difficulty getting to see decedent, and when they did they were harassed by Lena and Robert. Decedent could not receive any incoming calls on her telephone. Decedent told Charles that she was in prison. Lena and Robert *866 were present at the time the will drawn by Lonergan was presented for execution by Petersen, his law partner. The execution was not consummated because Petersen determined decedent did not possess testamentary capacity. Decedent then went to Penitenti to have him draw up the will. When decedent was advised by Penitenti that the will was ready to be executed, Lena accompanied decedent to a doctor for a physical examination. A certificate of competency was prepared by the doctor at either Lena's or decedent's request. Decedent then went to Penitenti's office with Robert. Lena, upon being called, also went to Penitenti's office. One of the witnesses to the will was procured by Robert and the other was procured at Lena's direction. One of these witnesses later made a statement that "... it was kind of a funny set up.... The old lady was making out the will and the other two [Robert and Lena] were doing all the talking."
In Estate of Rutherford, 153 Cal. App.2d 365 [314 P.2d 475], sufficient evidence of active participation on the part of the testatrix's sister was found to exist under the following circumstances: The testatrix's sister, the chief beneficiary under the will, discussed the matter of a will with the testatrix on several occasions; went with the testatrix to the attorney's office where the will was prepared; arranged for the attorney to bring the will to the sister's home; asked the subscribing witnesses to witness the will; and would not permit the testatrix to go to her home in another state after her son's death. (At p. 372.)
(7) With respect to the third element, i.e., undue benefit to those alleged to have procured the will, there can be no question that this element was established by substantial evidence. The will was an unnatural one in that it did not treat all of decedent's children equally. Charles and Rosie were bequeathed only $100 each and the residue was devised and bequeathed one-third each to Lena, Robert and Peter. Lena and Robert, two of the proponents, were active in procuring the execution of the will and received thereunder two-thirds of the residue of a substantial estate. In the light of the evidence, although in conflict, that decedent wanted her children to share equally in her estate, Lena and Robert would receive substantially more under the will than Charles and Rosie. Accordingly, the evidence is sufficient to sustain a determination that the will resulted in undue profit to Lena and Robert. (See Estate of Garibaldi, supra, 57 Cal.2d 108, 113.)
(8) Proponents argue that even if the presumption of undue influence did arise it was adequately rebutted. As already pointed out, upon the establishment of the presumption the burden shifted to proponents to produce proof by a preponderance of the evidence that the will was not induced *867 by undue influence. Whether this burden was met was for the trier of fact and not for the reviewing court. The credibility of the witnesses and the weight of the evidence was for the jury's determination.
We note, in conclusion, that contestant asserted undue influence only on the part of Lena and Robert, and not on the part of Peter, who, as a residuary legatee and devisee, also stood to receive substantially more than Charles and Rosie. The jury in its special verdict found that the execution of the purported will was obtained through the undue influence of Lena and Robert and upon this verdict a judgment was made and entered that said will be denied probate. The theory upon which the case was tried and upon which the verdict was rendered and judgment entered was that the whole will was the result of the presence of the undue influence of Lena and Robert. Accordingly, upon the finding of undue influence the will was totally invalidated. (Estate of Molera, 23 Cal. App.3d 993, 1001 [100 Cal. Rptr. 696]; Estate of Beckley, 233 Cal. App.2d 341, 348 [43 Cal. Rptr. 649]; Estate of Webster, 43 Cal. App.2d 6, 15 [110 P.2d 81, 111 P.2d 355].)
The judgment is affirmed.
Sims, J., and Elkington, J., concurred.
NOTES
[1] Pursuant to this will and codicil decedent made a specific bequest of $1,000 each to Robert and Lena and devised and bequeathed the residue of her estate equally to her children.
[2] This codicil made a specific bequest of a certain parcel of real property to Peter and named Rosie executrix and Charles the alternate executor.
[3] Pursuant to this will, decedent made specific bequests of $1,000 each to Robert and Lena; $1,000 to each of her grandchildren, and $6,000 to Rosie; devised her real property as follows: One parcel to Peter; one parcel to Peter and Rosie; one parcel to Lena; one parcel to Charles; two parcels to Rosie; and devised and bequeathed the residue of her estate to all of her children in equal shares.
[4] Unless otherwise indicated, all statutory references are to the Evidence Code.