[Civ. No. 15697. Second Dist., Div. Three. May 16, 1947.]

MINNIE WEST, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and CORA A. BEST, Respondents.

James B. Ogg for Petitioner.

R. C. McKellips and John A. Rowe, Jr., for Respondents.

SHINN, Acting P. J.—Petitioner, an insured employer, seeks to have annulled a total temporary disability award of the commission in favor of respondent and against petitioner. Respondent, a 60-year-old woman, was hired by petitioner on January 21, 1946, for $35 a week plus room and board as a practical nurse for petitioner's bedridden husband. Six days later, on January 27, 1946, a porch swing at petitioner's residence fell to the floor while respondent was sitting in it. Respondent claimed that her back was injured in this fall of the swing. The commission so found and issued the award before us.

Petitioner's attack upon the award merits discussion only as to the following points: (1) the existence of the employment relationship; (2) the activity of respondent at the time of the injury found; (3) the existence of the injury and of total temporary disability resulting therefrom; (4) average earnings.

Petitioner contends that the existence of the employment relationship between petitioner and respondent was not established. The evidence shows, however, that petitioner hired respondent and supervised her in her work. But petitioner further asserts that respondent's legal status was that of independent contractor and, if not, that her employment was only casual. These assertions are without merit. The legal relationship of a practical nurse to the one who hires her and supervises her in the details of her work as the record discloses occurred here is that of servant to master. (*New Amsterdam Casualty Co.* v. *Industrial Acc. Com.* (1934), 137 Cal.App. 719, 724 [31 P.2d 245].) Respondent's employment was not casual within the meaning of section 3354 of the Labor Code since the work contemplated was indefinite in duration. (*Melone* v. *Industrial Acc. Com.* (1935), 9 Cal.App.2d 569, 572-573 [50 P.2d 503].) As to respondent's activity at the time of the injury found, the fact that she then was resting is without legal consequence where her employment required her to live and board on the premises of her employer. (*Employers' etc. Corp.* v. *Industrial Acc. Com.* (1940), 37 Cal.App.2d 567, 569 [99 P.2d 1089] ; note, 158 A.L.R. 606.)

Petitioner's contention that the findings of the commission as to injury to respondent and the total temporary disability resulting therefrom are without substantial evidentiary support requires more extended treatment. These findings rest upon respondent's testimony, two medical reports and one X-ray report, all offered by respondent. Respondent testified in effect that she injured her back in the fall of the swing, that since that occurrence she had had a constant stinging pain around the end of her "tail bone" (coccyx), that medical treatment had been ineffective in permanently alleviating this pain, and that the severity of the pain prevented her from working. The first medical report, that of Dr. Rickabaugh, dated March 18, 1946, contains a diagnosis of sacroiliac sprain based upon respondent's account of the fall in the swing and the tenderness to pressure she exhibited over the sacroiliac joints, the body of the sacrum and the coccyx. It is significant that this report is silent as to the indispensable factor in diagnosis of the nature and cause of injury, in such cases, namely, the medical history of respondent prior to the fall. It states no reason whatever for bas-

ing a diagnosis of sacroiliac sprain upon tenderness in the lower back, it amounts to no more than a statement that the subject complained of pain, and in our opinion was not the statement of a medical opinion in the true sense. The second medical report, dated June 12, 1946, that of the White Memorial Clinic, sets forth a tentative diagnosis of ''Chronic lowback, sprain, mild; and Osteoarthritis.'' The diagnosis of osteo-arthritis was based upon an X-ray of the lumbar spine taken according to respondent's testimony less than three weeks prior to the commencement of her employment by petitioner. This medical report further states: ''patient was advised to work shorter hours, because of Osteoarthritis.'' The X-ray report on respondent's coccyx ''shows fusion of the several segments therefore but probably a developmental abnormality.'' The foregoing is a complete summary of all the evidence in the record from which the attacked findings might receive support. Analysis of this evidence reveals that respondent's testimony and Dr. Rickabaugh's report furnish the only support for these findings. ██ Dr. Rickabaugh's report adds little to respondent's testimony since an expert opinion is no stronger than the facts upon which it is based. (*Blankenfeld* v. *Industrial Acc. Com.* (1940), 36 Cal.App.2d 690, 698 [98 P.2d 584].) On the other hand, the record is replete with evidence opposed to these findings. The record shows that respondent pursued her normal routine of life just after the accident and did not seek medical treatment for over a week thereafter. Specifically, the following is established by unopposed evidence. Shortly after the accident respondent took a brief drive in her car. The evening of the accident she attended church. The morning following the accident she performed the duties of her employment in full until her employment was terminated by petitioner. She then moved with some assistance her small steamer trunk from petitioner's residence. The second day after the accident she attended the trial of a case in court.

██ Specifically as to injury the commission's records introduced in evidence show that respondent's back has been a recurrent source of compensation income to her. In 1941, she collected over $100 from a compromise settlement of her claim that she had sprained her wrist and back in a fall suffered while working as a practical nurse. At that time she stated that within the prior two years she had injured her spine at least three times. X-ray examination of her back,

however, revealed *nothing* except a congenital anomaly in the lumbar region and some slight arthritic development in the sacroiliac area, which development was not of recent origin. When her attention was distracted during the physical examination of the area of her back, which she claimed was paining her, she exhibited no signs of pain even under heavy pressure upon that area. She had a normal range and freedom of spinal movement. Her medical history did indicate as possible causes of her claimed back discomfort her diabetic condition and her chronic bowel disorders. In 1944, respondent again collected compensation indemnity in the amount of approximately $160 by way of a compromise settlement of her claim that she had injured her chest and back in another fall. Medical examination, however, including X-rays of her lumbar spine and sacrum, showed no signs of old or recent injury to her back although the X-rays did disclose marked osteoarthritic changes in her spinal column. Notwithstanding her complaint of excruciating pain throughout the physical examination of her back all her body motions were then observed to be quick, complete, and unaccompanied by muscle spasm.

Specifically as to total temporary disability respondent testified that following the accident she made no effort whatsoever to obtain employment but did remarry. She further admitted that she had gone on county relief upon her arrival in Los Angeles from Sacramento in the last part of November, 1945, that she remained on such relief continuously thereafter including the week of her employment by petitioner, and that she was still receiving such relief in June, 1946. According to respondent, this relief was given her on account of her inability to work. From this testimony of respondent it would seem then that the claimed injury had no effect upon her ability to work. In this connection it is to be noted that the White Memorial Clinic merely recommended shorter hours of work and that because of osteoarthritis.

In summary the record shows that respondent has been a willing seeker after compensation income and that the condition of her back in February, 1946, was both arthritic and chronic. Aside from her own testimony and Dr. Rickabaugh's report there is nothing in the record tending to prove that respondent was injured in the fall of the swing or that this fall aggravated or exacerbated the then existing

defective condition of her back. Dr. Rickabaugh's report contains no medical history of respondent prior to the fall of the swing and is palpably based upon a superficial and inadequate medical examination of respondent. Accordingly it should be disregarded on account of its unsatisfactory nature and because it is at variance with the whole current of expert evidence. (*United States F. & G. Co.* v. *Industrial Acc. Com.* (1928), 95 Cal.App. 186, 191 [272 P. 589]; *Winthrop* v. *Industrial Acc. Com.* (1931), 213 Cal. 351 [2 P.2d 142].)

This leaves merely respondent's testimony to support the findings of injury and total temporary disability. Respondent's testimony upon these points is to the effect that she has been in such constant and severe pain since the accident that she has been unable to work. ■ While the person who claims to have been injured is ordinarily the first person who should testify as to whether he is suffering pain (*Employers etc. Corp.* v. *Industrial Acc. Com.* (1941), 42 Cal. App.2d 669, 671 [109 P.2d 716]) it should be borne in mind that the law does not award compensation for mere pain unless it is of such a character as to raise a presumption of incapacity to earn. (*Marsh* v. *Industrial Acc. Com.* (1933), 217 Cal. 338, 344 °[18 P.2d 933]; *Associated Indem. Corp.* v. *Industrial Acc. Com.* (1945), 71 Cal.App.2d 820, 824 [163 P.2d 771].) ■ Similarly, although the employee may testify as to his inability to work (*Western Pac. R. R. Co.* v. *Industrial Acc. Com.* (1936), 17 Cal.App.2d 119, 120 [61 P.2d 459]) a hidden physical impairment of the back such as respondent claimed is a matter properly cognizable only by those trained and expert in such matter. (*Pacific Employers Ins. Co.* v. *Industrial Acc. Com.* (1941), 47 Cal.App.2d 494, 500-501 [118 P.2d 334]; *Simpson Co.* v. *Industrial Acc. Com.* (1925), 74 Cal.App. 239, 243 [240 P. 58].) ■ While it is the province of the commission to determine the credit and the weight to be given the evidence, the commission may not disregard facts established by the evidence. (*Bussey* v. *Industrial Acc. Com.* (1938), 26 Cal.App.2d 211, 212 [79 P.2d 169]; *Moquin* v. *Industrial Acc. Com.* (1939), 33 Cal. App.2d 511, 516 [92 P.2d 413].) ■ Findings of fact of the commission like those of a trial court may be set aside and an award based thereon annulled if the findings are contrary to the evidence, read as a whole, or without meritorious support in the evidence. (*Nielsen* v. *Industrial Acc.*

*Com.* (1934), 220 Cal. 118, 122 [29 P.2d 852, 30 P.2d 995]; *Pacific Palisades Assn. v. Menninger* (1933), 219 Cal. 257, 267 [26 P.2d 303]; *Williams* v. *Kidd* (1915), 170 Cal. 631, 642 [151 P. 1, Ann.Cas. 1916E 703]; *Smith* v. *Belshaw* (1891), 89 Cal. 427, 430 [26 P. 834].) ▆ Stated otherwise the rule of review is that an award of the commission will be set aside if no reasonable man could reach the conclusion the commission reached. (*Engels Copper Min. Co.* v. *Industrial Acc. Com.* (1920), 183 Cal. 714, 717 [192 P. 845, 11 A.L.R. 785].)

The fundamental principle that there shall be but one trier of the facts assumes that the trier of the facts will use every reasonable means at his disposal to ascertain the truth concerning disputed matters. The inadequacy and incompleteness of the record in this case manifestly shows that the commission here did not properly discharge this basic duty of discovery of the facts. ▆ The commission is a court (*Bankers Indem. Ins. Co.* v. *Industrial Acc. Com.* (1935), 4 Cal.2d 89, 97 [47 P.2d 719]) deliberately clothed by the Legislature with administrative facilities to permit it to develop the facts in reference to matters not generally known to laymen. It was not intended that the litigants before it be impaled upon the results of their lack of familiarity with the often occult problems of medical science frequently arising in compensation cases. As a consequence the commission may not leave undeveloped matters which its acquired, specialized knowledge should identify as requiring further evidence. In this case the resolution of the issues of injury and disability was not patent. Medical evidence thereon was therefore required. Under these circumstances the commission had the responsibility of seeing to it that such evidence was reasonably complete, whether by use of its own medical experts or otherwise.

▆ As society's representative it is the duty of the commission to do equal justice between employer and employee (*McManus* v. *Lindberg* (1936), 47 Ariz. 214 [54 P.2d 997, 999]). As the same court said in a more recent case: "However, perfection and absolute accuracy are not expected; all that can reasonably be demanded is an honest and conscientious effort to do the right thing. It is too bad if some who are entitled to compensation are denied it, but it must be remembered that all claimants for compensa-

tion are not entitled to it. It is as much the duty of the commission to deny compensation to a malingerer or to one who is not an employee as it is its duty to grant compensation to the honest employee who is actually injured in the line of duty.'' (*Holmes* v. *Osborn* (1941), 57 Ariz. 522 [115 P.2d 775, 789].) Applying the foregoing established legal rules to the case before us, the award of the commission must be annulled.

We do not hold that the testimony of a claimant of disabling pain may not properly be accorded greater weight by the commission than is accorded medical testimony that no cause for the pain could be found upon expert examination. Such evidence may be satisfactory and sufficient to sustain a finding of disability. We do hold that the testimony of respondent that she suffered such pain as a result of her alleged injury as to incapacitate her for work was wholly unsubstantial and without probative value. In view of respondent's admitted activities following the alleged injury, her belated complaint of injury and visit to a physician, her ability to carry on her household duties after her remarriage, and her proven disposition to use a chronic lower back condition, which, as she claimed, habitually caused disabling pain, as a convenient source of income through claims of injury, her mere assertion that the fall in the swing caused disabling pain, opposed as it was by reliable expert evidence, and supported by none of any substance, was not sufficient to establish liability of petitioner as her employer. The realities of the situation were too obvious to be overlooked.

The power of the commission to make determinations of fact is indeed broad, but it may not be exercised in disregard of fundamental concepts as to what constitutes legal proof and of the duty to fairly weigh evidence. A reviewing court should not consider itself bound by a finding of the commission which has no reasonable basis in the evidence. We consider this such a case.

Were we to rule otherwise as to the sufficiency of the evidence, the award would nevertheless have to be annulled because, as will be developed shortly, the commission erred as a matter of law and accordingly exceeded its jurisdiction in its application of section 4453 of the Labor Code in computing the amount of the award. Upon annulment of the award, unless otherwise ordered, the case goes back to the commission for retrial of all of the issues of fact initially

before the commission. (*Winthrop* v. *Industrial Acc. Com.* (1934), 220 Cal. 114 [29 P.2d 850] ; *Nielsen* v. *Industrial Acc. Com., supra,* 220 Cal. 118, 120 [29 P.2d 852, 30 P.2d 995].)

In regard to average earnings petitioner contends that the commission's award is unreasonable in amount and therefore in excess of its powers. Petitioner asserts that in computing respondent's average earnings on a full-time basis at the rate of pay at the time of the accident, the commission ignored respondent's true earning capacity at that time as shown by such evidence as there was as to her actual earnings during the year immediately preceding the accident.

In California as elsewhere a compensation award consists of a money payment and medical care. (*Western Metal Supply Co.* v. *Pillsbury* (1916), 172 Cal. 407, 419 [156 P. 491, Ann.Cas. 1917E 390] ; Dodd, Adm. of Workmen's Compensation (1936), p. 41.) The purpose of the award is not to make the employee whole for the loss which he has suffered but to prevent him and his dependents from becoming public charges during the period of his disability. (*Union Iron Wks.* v. *Industrial Acc. Com.* (1922), 190 Cal. 33, 39-40 [210 P. 410].) In short the award transfers a portion of the loss suffered by the disabled employee from him and his dependents to the consuming public. (*Western Indem. Co.* v. *Pillsbury* (1915), 170 Cal. 686, 693 [151 P. 398].) Complete protection is not afforded the employee from disability because this would constitute an invitation to malinger or to be careless on the job as he would then lose nothing in assuming a disabled status. (1 Schneider, Workmen's Compensation Law (Per. ed. 1941) p. 6.)

The money payment is supposed to represent a specified portion of the disabled employee's loss in earning capacity as such capacity existed at the time disability began. (Dodd, op. cit., *supra,* p. 687.) "Average Earnings" is our statutory term for the basis upon which actual past earnings are computed in order to arrive at such earning capacity. The computation of this earning capacity is, of course, not independent of the fundamental purpose of the award just set out. As a consequence there is provided a maximum and minimum for all average earnings. Exact ascertainment of earning capacity is further departed from by providing certain specific computation formulae for the purpose of taking care of the ordinary run of cases in speedy and uniform fashion.

But earning capacity at the time disability began remains as the base upon which the money payment is computed. By "Average Earnings" nothing more is meant than earning capacity.

Section 4453 of the Labor Code is the provision governing the computation of average earnings on a weekly basis. It has four subdivisions. One of these, (b) covers employment by two or more employers. Since it is inapplicable to the case before us, it will not be considered further. The other three pertain to various types of employment by one employer. Subdivision (a) applies to full-time work, while subdivision (d) applies to part-time work. Subdivision (c) applies to two situations—earnings at an irregular rate or specified to be by the week, month, or other period. Subdivision (d) also applies where (a), (b) or (c) "can not reasonably and fairly be applied." It defines average weekly earnings as 95 per cent of the sum "which reasonably represents the average weekly earning capacity of the injured employee at the time of his injury, due consideration being given to his actual earnings from all sources and employments." Thus earning capacity at the time of injury is the touchstone of average earnings in California. Consequently the various statutory methods of computation of average weekly earnings set forth in subdivisions (a), (b) and (c) possess validity only to the extent they truly reflect actual earning capacity at the time of injury.

What constitutes such earning capacity? Earning capacity is composed of three factors: (1) ability to work; (2) willingness to work; and (3) opportunity to work. (*Mahoney Co.* v. *Marshall* (WD Wash. 1931) 46 F.2d 539, 545.) It has been suggested, however, that the history of the statutory definition of average earnings in California shows that earning capacity at the time of injury does not include the third factor, opportunity to work.

We turn therefore to a consideration of such statutory history. The earliest compensation legislation in California was the Roseberry Act of 1911. This act differed from the present law in that its one specific formula for the computation of average earnings applied only to full-time employees—employees of a class working substantially the whole of the year immediately preceding the injury; and the earning capacity considered was limited to that in the employment in which injury occurred. (Stats. 1911, ch. 399, p. 800.) The Boyn-

ton Act of 1913, which supplanted the Roseberry Act, merely broadened the concept of earning capacity to include therein employment similar to the one in which injured but not of a higher class. (Stats. 1913, ch. 176, pp. 288-289; Stats. 1915, ch. 607, pp. 1086-1087.)

The present law in its original form was passed in 1917. It changed both the definition of full-time employment just mentioned and the formula for the computation of the average earnings therein. In recognition of the trend from the six-day week to the five-day week, two hundred sixty days a year was declared to be full-time employment. The daily earnings at the time of injury, instead of the average daily wage paid when working during the year immediately preceding the injury, were used to compute average weekly earnings. Earning capacity was further broadened to include all sources and employments, but the earnings from other occupations could not be included at a wage rate in excess of that paid at the time of injury. The special formula for the computation of earnings at an irregular rate or on a periodic basis was added. (Stats. 1917, ch. 586, pp. 842-843.)

The only basic later change made was the 1933 amendment which redefined full-time employment on a weekly rather than an annual basis, introduced the multiple employer computation formula, removed the limitation on earning capacity just stated, and withdrew seasonal work from the specific initial coverage of the earning capacity subdivision. (Stats. 1933, ch. 522, pp. 1343-1344.) It may well be a reasonable inference from the general economic conditions prevailing at the time of the enactment of the 1933 amendment that its purpose was to remove from the statutory concept of earning capacity at the time of injury the factor of opportunity to work so far as full-time permanent employees were concerned.

That is not the question before us. Respondent was working as a practical nurse at the time of the accident. Such employment is by its very nature intermittent. A practical nurse goes from case to case. Continuity of such employment is the exception rather than the rule. Yet the commission computed respondent's average earnings under subdivision (a) on the ground that her employment was full-time, that is, in excess of the statutory minimum therefor—the thirty-hour, five-day week. We note that an equally good prima facie case exists for computing them under subdivision

(c) in view of the fact that her earnings were specified to be by the week. But it is unnecessary to decide this point. Neither (a) nor (c) can be used if they "can not reasonably and fairly be applied." If such a situation exists, resort must be had to subdivision (d). This is the situation here. It is not fair and reasonable to use either (a) or (c) because they both ignore the element of discontinuity in respondent's employment. (Cf. *Neahr* v. *Industrial Acc. Com.* (1936), 13 Cal.App.2d 146 [56 P.2d 568]; *Mahaffey* v. *Industrial Acc. Com.* (1917), 176 Cal. 711 [171 P. 298].)

Accordingly, the award is sustainable only if computed correctly under (d), the earning capacity subdivision. The award was computed at the rate of pay at the time of the accident on the basis of full-time work. This method of computation under this subdivision has been affirmed when applied to permanent full-time employees irregularly employed due to generally poor business conditions (*California C. I. Exch.* v. *Industrial Acc. Com.* (1933), 135 Cal.App. 746 [27 P.2d 782]), temporary full-time employees (*Department of Water & Power* v. *Industrial Acc. Com.* (1933), 130 Cal. App. 231 [19 P.2d 832]), seasonal employees (*Howell* v. *Industrial Acc. Com.* (1941), 47 Cal.App.2d 326 [117 P.2d 919]), and intermittent employees. (*Aetna Life Ins. Co.* v. *Industrial Acc. Com.* (1933), 130 Cal.App. 488 [20 P.2d 372]; *Colonial etc. Ins. Co.* v. *Industrial Acc. Com.* (1941), 47 Cal.App.2d 487 [118 P.2d 361].) On the other hand, an award under this subdivision based upon an evaluation of an intermittent employee's past earnings within the year immediately preceding the injury was affirmed in the Neahr case.

We believe the Neahr decision correctly interprets subdivision (d) as applied to intermittent employees. As previously stated and as conceded in the California Exchange case at page 753, ordinarily opportunity to work is a factor of earning capacity. The opportunity to work of the intermittent employee normally is not equal to that of the full-time permanent employee. That circumstance is an element of considerable importance in the choice of a job or a trade. To take the rate of pay at the time of injury and apply it on a full-time basis in computing earning capacity at that time is to ignore an established incident of intermittent employment—its discontinuity. The result may often be to give to the disabled employee a greater income from a compensation

award for idleness during disability than he received while working and to bestow upon him an income far in excess of his true earning capacity. When so administered a law, the fundamental purpose of which is to shift merely a portion of the loss in earning capacity of the disabled employee from such employee and his dependents, is distorted into a device whereby it would be more profitable to be on compensation than it would be to work. Such an administration of the workmen's compensation law would invite both carelessness on the job and malingering and is therefore contrary to public policy.

▉ Earning capacity under subdivision (d) cannot properly be determined by reference to the rate of pay alone, as the Aetna (p. 493) and Colonial (p. 492) decisions erroneously assume. Fundamentally, earning capacity is total earnings measured against the period of time within which those earnings were made. Whether the earning capacity rate is identical with the pay rate depends upon the steadiness of employment. Thus, the particular wage rate an employee is receiving at the moment of injury may or may not be indicative of his actual earning capacity at that time.

▉ The statutory formulae for the calculation of average earnings cannot be blindly applied. As stated earlier they are valid only to the extent their application results in ascertaining actual earning capacity at the time of injury. This is so because their use is subject to the reasonable and fair limitation stated in subdivision (d) which we have paraphrased and quoted. If they "cannot reasonably and fairly be applied," earning capacity as defined in subdivision (d) must be determined. ▉ In making this determination due consideration must be given to the earning history of the disabled employee. We agree with the statement in the Aetna decision at page 492 that due consideration means reasonable and not exclusive consideration. But earning history must be considered in arriving at earning capacity, and more often than not, it will be determinative.

We now proceed to examine the award before us in the light of the foregoing discussion and particularly with respect to the three factors which make up earning capacity at the time of injury. As to the first factor, ability to work, respondent testified in effect that she had been on county relief since her arrival in the county in November, 1945, because of her in-

ability to work. As to the second factor, willingness to work, one overlooked in the Aetna decision, respondent testified: "I work when I can." As to the third factor, opportunity to work, respondent's testimony is silent unless it may be inferred that she included this factor in her declaration of inability to work. In the California Exchange decision at page 753, the novel proposition is advanced that it is incumbent upon the employer to introduce evidence as to the employee's lack of opportunity to work. We say novel because the common experience of man informs us that the wage earner typically will work if he can in order to give as much support as he is able to his dependents and himself. Therefore, it is more logical to rule that when the evidence discloses periods of unemployment, the employee has the burden of explaining them. (Cf. *Meyers* v. *Industrial Acc. Com.* (1940), 39 Cal.App.2d 665, 669 [103 P.2d 1025].) The commission is certainly informed generally as to the conditions of the labor market and the opportunities for work.

 The commission could not properly evaluate respondent's earning capacity under subdivision (d) on the present record. If prior to her employment by petitioner respondent possessed no ability to work, as a literal understanding of her testimony indicates to be the fact, she suffered no compensable loss by reason of the claimed injury. But if she did possess such ability, notwithstanding her testimony to the contrary, two equally plausible surmises present themselves. The general condition of the labor market prevailing in the fall of 1945, and the following winter would indicate that her unemployment was by choice. On the other hand, her unemployment may have been due to lack of opportunity to engage in the work of practical nursing. In any event, the record contains nothing as to her employment or unemployment prior to her single week's employment by petitioner except her relief status and the fact that she once had had a two-month nursing job in Sacramento. Faced with such an inadequate and incomplete record, the commission was unable to perform its statutory duty of giving due consideration to respondent's earning history. It could not properly evaluate respondent's earning capacity at the time of the accident pursuant to subdivision (d) of section 4453 of the Labor Code. Accordingly, the award must be annulled as the result of an erroneous application of the law and as unreasonable. (Lab. Code, § 5952.)

The case is remanded to the commission for further proceedings not inconsistent with this opinion.

Wood, J., and Kincaid, J. pro tem., concurred.

A petition for a rehearing was denied June 5, 1947, and respondent's petition for a hearing by the Supreme Court was denied July 10, 1947. Carter, J., voted for a hearing. Traynor, J., did not participate.