[Civ. No. 35397. Second Dist., Div. Four. July 23, 1970.]

CHRISTINE M. BARON, Plaintiff and Respondent, v.
STANLEY BARON, Defendant and Appellant.

936

COUNSEL

Jacob M. Kartzinel for Defendant and Appellant.

Freshman, Marantz, Comsky & Deutsch and Warren C. Deutsch for Plaintiff and Respondent.

## OPINION

**DUNN, J.**—On June 10, 1969, an interlocutory judgment was entered, granting a divorce to plaintiff on her complaint and to defendant on his cross-complaint. The judgment further declared certain property to be separate and other community, and ordered defendant to pay alimony, child support and attorneys' fees. Defendant appeals from the judgment, except insofar as it awards a divorce to both parties. In his briefs, appellant argues: (1) the residence of the parties was his separate property, not community, and should have been awarded to him in entirety; (2) the trial court erred in requiring him to pay alimony, (3) child support and (4) attorneys' fees; and (5) the court failed to make findings required by law.

### I. *The Findings And The Record.*

Before us are, in addition to the reporter's transcript, the pleadings, several minute orders, an interlocutory judgment of divorce and notices of entry thereof, a notice of motion for new trial and a notice of appeal. One minute order, dated April 17, 1969, sets forth the trial court's findings and decision, and the interlocutory judgment repeats these and carries them into effect, disposing of the property of the parties. ■ No instrument designated "Findings of Fact and Conclusions of Law" was filed and appellant contends this is error requiring a reversal. We disagree.

■ Under prevailing custom and practice, findings and conclusions ordinarily are set forth in a separate instrument. However, neither statute nor rule requires that this be done.[1] Where findings are required and none are made or, if made, are inadequate, a judgment must be reversed. *Auer v. Frank* (1964) 227 Cal.App.2d 396, 406 [38 Cal.Rptr. 684, 8 A.L.R.3d 1108]; *Morrow* v. *Morrow* (1962) 201 Cal.App.2d 235, 238 [20 Cal.Rptr. 338]. This rule is based upon the premise that findings are required in order that the parties may be informed of the trial court's determination of factual issues and so that the parties may point out any errors therein to the court on motion for new trial or on appeal. *Sutter* v. *Madrin* (1969) 269 Cal.App.2d 161, 169 [74 Cal.Rptr. 627]. ■ "The purpose of findings is to answer questions raised by the pleadings and to make the case more susceptible to review by disclosing the exact grounds upon which the judgment rests." *Estate of Pack* (1965) 233 Cal.App.2d 74, 78 [43 Cal.Rptr. 361]. Quite obviously this purpose may be served when findings are contained in the judgment itself as well as when contained in a separate instrument. ■ In the present case, such findings are contained in the judgment. ·

---

[1]See: Code of Civil Procedure section 632 and rule 232, California Rules of Court, both effective January 1, 1969. The trial occurred in March, 1969.

■ Appellant was, however, deprived of any opportunity to file objections to the findings (see fn. 1, re: rule 232) because of erroneous procedures followed by the trial court.[2] ■ In the absence of such opportunity in the trial court, this court will extend to appellant the benefits of section 634 of the Code of Civil Procedure[3] which, in essence, provides that an appellate court shall not infer that a trial court found in a respondent's favor as to any findings which are ambiguous, contradictory or incomplete on a material fact or issue, and which were objected to in the trial court.

Appellant's brief fails to direct our attention to any omission of the trial court to find on any issue, or to any ambiguity or conflict in the findings. His entire argument is that: "Defendant feels that if the court had to make findings, the inequities in this case would be so glaring that there is a distinct possibility that the trial court would not have made an order which is impossible for defendant to carry out without liquidating his assets." Such argument is unavailing and we therefore proceed to appellant's other points.

## II. *The Residence.*

■ The undisputed evidence shows that the residence, at 7604 Willow Glen Road in Los Angeles, was conveyed to the parties by grant deed designating them as husband and wife taking as joint tenants. Civil Code section 164 (now Civ. Code, § 5110) provided: ". . . that when a single family residence of a husband and wife is acquired by them during marriage as joint tenants, for the purpose of the division of such property upon divorce or separate maintenance only, the presumption is that such single family residence is the community property of said husband and wife." The court found the residence to be community property, fixed its value at $60,000 less the anticipated costs of selling it and loans then encumbering it, and ordered that appellant pay to respondent her one-half share of the net value in monthly installments.

---

[2]In its minute order of April 17, 1969, the trial court directed: "Attorneys for plaintiff to prepare . . . findings and conclusions." Such were prepared but were not signed by the trial judge who stated they were made unnecessary by the failure of any party to request them, as required since January 1, 1969 by Code of Civil Procedure section 632 and by rule 232. Appellant pointed out to the trial court that he failed to request findings only because the court already had ordered them prepared, and the law does not require idle acts (Civ. Code, § 3532), but the trial court held this to be no excuse. We think this was erroneous, the court's order having lulled appellant into inactivity.

[3]Code of Civil Procedure section 634 states: "When written findings and conclusions are required, and the court has not made findings as to all facts necessary to support the judgment or a finding on a material issue of fact is ambiguous or conflicting, and the record shows that such omission, ambiguity or conflict was brought to the attention of the trial court . . . it shall not be inferred on appeal . . . that the trial court found in favor of the prevailing party as to such facts or on such issue."

■ The presumption required by Civil Code section 164 is a rebuttable one (*Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 211-212 [259 P.2d 656]; *Hunter* v. *Hunter* (1962) 202 Cal.App.2d 84, 89-92 [20 Cal.Rptr. 730]; *Lovetro* v. *Steers* (1965) 234 Cal.App.2d 461, 468-469 [44 Cal.Rptr. 604]) affecting the burden of proof (Evid. Code, § 605) and its effect "is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.) "Burden of proof" is defined (Evid. Code, § 115) to mean "the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court. The burden of proof may require a party to raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." (Also see: Evid. Code, § 190.) ■ This definition is for use by the trial court to guide it in weighing the evidence and resolving the issues. Its significance to an appellate court is limited. (3 Witkin, Cal. Procedure (1954) pp. 2246-2247, Appeal § 84 (2).) ■ An appellate court cannot reweigh the evidence and, until the contrary is established, must assume the trial court followed the appropriate rule regarding burden of proof in resolving the issues.

■ Since a presumption no longer is evidence in California (Evid. Code, § 600) we must examine the record to ascertain if any substantial evidence (Evid. Code, § 140) supports the finding of the trial court, governed by these rules: " 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' . . . The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict." *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].

■ The parties married in San Francisco on October 8, 1959, and separated June 21, 1967. At the time of the marriage the wife was employed, the husband was not. A week later, the husband came to Los Angeles to work and the wife remained in San Francisco for three months, working and buying furniture for the apartment. She, too, then moved to Los Angeles where the couple occupied an apartment. The wife continued to work and supported them until February 1960. On January 1, 1962,

they purchased a house on South Ardmore Street in Los Angeles and received title to it in joint tenancy, as husband and wife. Meanwhile the husband had gone to work for Union Oil Company on June 25, 1961.

The purchase price of the Ardmore house was $25,500 and the initial $1,000 down payment was made with money received from appellant's parents as a gift.[4] Appellant's uncle held a mortgage on the property. Later, appellant's parents paid him what was owed and took over the mortgage. Regular monthly payments on the loan were made from the husband's earnings.

The Ardmore house was sold in March 1966 for either $32,500 or $34,500 and was free and clear at the time of sale. A year before, the parties had purchased the lot at 7604 Willow Glen Road, using proceeds from a loan obtained on a note signed by both parties as borrowers and secured by a trust deed on the property. Appellant had the loan papers drawn up and asked respondent to sign them, which she did.[5] The parties thereafter built a house on the lot, moving into it in April of 1966. The money to buy the lot and build the house came from the proceeds of the sale of the Ardmore house.

There is evidence that the Ardmore house was community property and that property did not lose its character as such by reason of a change of form or identity into the Willow Glen property. (10 Cal.Jur.2d 680-682, Community Property § 18.)

While the record contains contradictory evidence, the evidence outlined supports the finding that the house on Willow Glen Road was community property. ▮▮▮ "[1-3] The agreement, understanding or intention of a husband and wife respecting the status of their property, as to whether it is separate, community, or joint tenancy, is determinative of that status . . . their agreement may be expressed or implied . . . their understanding or intention may be inferred from their conduct or declarations . . . [5] How-

---

[4]"Q. . . . How did the parties decide to buy the home on Ardmore?

"A. Well, Mr. Baron's parents said they wanted to help us out, and they would give us a down payment on a house, and we looked around, and we found a house, and they put up the down payment and we moved in."

"Q. You stated that Mr. Baron's parents stated to you that they wanted to make a present to you of a down payment; is that right?

"A. That is right."

[5]"Q. And now as far as signing the documents for the loans for the Mt. Olympus property in the sum of $35,000, which has just been made an exhibit, did you have those papers drawn up, or did Stanley, or who made the arrangements for the loan as far as you know?

"A. He did.

"Q. All right. And he asked that you sign the documents?

"A. I am sure I did."

ever, it [a presumption that the parties intend to hold property as indicated in a conveyance] may not be overcome solely by evidence as to the source of the funds used to acquire the property . . . or by evidence of a secret intention of one of the parties." *Knego* v. *Grover* (1962) 208 Cal.App.2d 134, 141 [25 Cal.Rptr. 158]. Furthermore, as stated by the court in *Hutchinson* v. *Hutchinson* (1963) 223 Cal.App.2d 494, 501 [36 Cal.Rptr. 63] (decided before enactment of that portion of Civ. Code, § 164 hereinbefore recited): "[9] The general principle of law applicable to the situation has again been stated by our Supreme Court in the recent case of *Machado* v. *Machado* . . . as follows: 'Although a joint tenancy deed is not conclusive as to the character of real property, it creates a rebuttable presumption that it is held in joint tenancy. The presumption created by the deed cannot be overcome by testimony of the hidden intentions of one of the parties, but only by evidence *tending to prove a common understanding* or an agreement that the character of the property was to be other than joint tenancy.' "[6] The court went on to state (on p. 503): "We think that in the instant case the trial court's finding that the home was the community property of the parties is supported by substantial evidence, i.e., that this was their common understanding. [10] As held in *Estate of Sill,* . . . such understanding is not required to be in any particular words or be attended with any particular formality."

We conclude there was substantial evidence to support the finding of the trial court that the single-family residence occupied by appellant, at 7604 Willow Glen Road, Los Angeles, was community property.

### III. *Alimony And Child Support.*

The parties separated in June 1967. Appellant left his employment with Union Oil Company in September 1968, at which time he was employed as a "forms analyst" and was earning $895 a month gross, having a take-home pay of $781.50. He had additional income of $150 per month derived from operating Fidelity Stamp Company, admittedly a community enterprise, which company sold trading stamps to operators of small businesses, the merchants redeeming the stamps from their customers.

Appellant left his employment with Union to become store manager of a

---

[6]The Ardmore house was acquired by the litigants as husband and wife in joint tenancy. Though appellant contends the funds to purchase it were intended as a gift to him, alone, and that such house was his separate property (Civ. Code, § 163) he nevertheless testified that he never discussed its ownership with respondent. Any intention that the property be separate was thus a "hidden intention" and fails to show a "common understanding."

statue business called "Hank of Hollywood," owned by his father. He did this because of his belief that he had a better future in the new business. At the time of trial, he was earning $600 gross per month and $527.20 net as store manager and, in addition, still derived $150 per month from the stamp business. Since he operated the stamp business from his home, he charged off of his income tax 44 percent of the cost of operating his home.

The court disposed of hitherto undiscussed significant assets of the parties as follows:

(1) The value of the trading stamp company was established at $6,000 of which the court awarded one half to the wife, plus $1,600 as her share of the profits from it, for a total of $4,600. The court ordered the husband to pay this sum to the wife in 60 monthly installments, the installments to include payment of her one-half share of the value of the house. The unpaid principal was to bear 5 percent interest, to be payable monthly with each installment of principal.

(2) 171 shares of Union Oil Company stock and 100 shares of Texas Gulf Sulphur Company were ordered divided between the parties. (At the time of trial, appellant had used these stocks as loan collateral to obtain money for living expenses.)

After the separation, the wife moved to a 3-bedroom apartment taking their two children with her. She found secretarial work, and at the time of trial was earning $464 gross per month and $364 net, plus medical insurance for herself. During week-days David (born June 10, 1960) went to school and Julie (born October 20, 1963) was left with a babysitter. Respondent's monthly expenses for herself and the children were claimed to be:

$125 — rent
200 — food
100 — clothing
50 — transportation
50 — medical
25 — laundry
25 — utilities
40 — insurance
60 — payments on automobile

$675 — Total; plus other anticipated "extraordinary" expense

The court ordered that appellant pay to respondent $200 per month ali-

mony for support and maintenance and $250 per month for child support, *i.e.*, $125 each. Thus, the monthly funds made available to the wife are:

$364 — net earnings
200 — alimony
250 — child support
_____
$814 — Total

To this must be added the payments for her share of the value of the house and the stamp business.

The husband had previously been married and divorced. There were three minor children of this earlier marriage. In February 1965 custody of these children was awarded to appellant and they came to live with him and respondent. They were living with appellant at the time of trial, at which time they were aged 15, 13 and 11. The husband employed a woman to work full time at the house to cook, clean and watch over the three children while he was at work. He had the full expense of supporting the children and himself. His spendable income per month at the time of trial was:

$527.20 — take home pay, "Hank of Hollywood"
150.00 — income from stamp company
_____
$677.20 — Total

From this amount, the judgment required that he pay to plaintiff $450, leaving him $227.20 per month to support himself and his three children. Additionally, appellant was ordered to pay $750 by way of respondent's combined attorneys' fees and costs, at the rate of $75 per month until paid, which would mean over a period of 10 months. Finally, he was required to liquidate the net value of the house and the stamp business and to pay to respondent her share thereof in monthly installments, plus interest on the unpaid principal.

The inequity of this portion of the judgment is self-evident, bearing particularly in mind that the two minor children, whose custody was awarded to respondent, were each to receive $125 per month. The three minor children of appellant's first marriage were thus grossly discriminated against.

One rule guiding courts in awarding alimony and child support is that: "In the exercise of its discretion, the trial court must consider the needs of the dependents and the ability of the husband to meet those needs . . . [2] Its orders, however, need not be based upon the actual income or property of the husband, but may be based solely upon his ability to earn money." *Pencovic* v. *Pencovic* (1955) 45 Cal.2d 97, 100 [287 P.2d 501].

In the present action, the only evidence of appellant's ability to earn more than he was earning at the time of trial is that, when last employed by the oil company, he earned $895 gross and $781.50 net per month. Had he remained on that job to the time of trial, at the same net salary, he would have had a spendable monthly income as follows:

$781.50 — Union Oil Company
150.00 — Trading Stamp Company
_____
$931.50 — Total

Subtracting therefrom the following monthly awards:

$200.00 — alimony
250.00 — child support
_____
$450.00 — Total

he would have had $481.50 left over from which to pay $75 each month for attorneys' fees and costs, the remainder to be used in supporting himself and his three children. Assuming he was not legally entitled to change jobs, and thus reduce his earnings to the detriment of respondent and the two children, he still would have found himself in rather dire straits, supporting himself and three children on an available $406.50 per month. This contrasts with the $814 per month available to the wife to support herself and the two children, plus $75 for her attorneys.

Again assuming appellant had remained employed by Union Oil Company, which he did not, the language of our Supreme Court in *Hall* v. *Hall* (1954) 42 Cal.2d 435, 442 [267 P.2d 249] seems apropos: "[7] Here, the wife and daughters were given $550 per month and the family home. When the amounts of life insurance premiums, taxes, and other fixed charges which Hall must pay are added, only $270 remains for his living expenses. Although the discretion of the trial court should be upheld if it has been reasonably exercised, the needs of the respective parties do not justify the amount of alimony here allowed to the wife."

## IV. *Attorneys' Fees.*

In the light of the circumstances disclosed by the record we find no abuse of the trial court's discretion insofar as it fixed the amount of the attorneys' fees and expenses, to be paid by appellant, at $750. However, ordering this to be paid in 10 monthly installments of $75 each seems an unnecessary acceleration in view of the other monthly payments required of appellant.

So far as the judgment orders appellant to pay $200 alimony and $250 child support, and to pay attorneys' fees in 10 installments, it is reversed; in all other respects it is affirmed.

For the trial court's guidance on retrial, its attention is directed to *Hall* v. *Superior Court* (1955) 45 Cal.2d 377, 381 [289 P.2d 431] and particularly to those paragraphs numbered 2, 3, 4 and 5.

Files, P. J., and Jefferson, J., concurred.