[Nos. D006665, D007345. Fourth Dist., Div. One. Oct. 19, 1989.]

In re the Marriage of MARVELLE MARCHANT and FRANK LEE REGNERY.
MARVELLE MARCHANT REGNERY, Respondent, v.
FRANK LEE REGNERY, Appellant.

**COUNSEL**

Alan S. Hersh for Appellant.

Ramon D. Asedo for Respondent.

**OPINION**

**WORK, J.**—In these consolidated appeals from a judgment of dissolution and posttrial orders, Frank Regnery contends the trial court erred in refusing to modify temporary spousal and child support, in awarding permanent support, and in its postdissolution order denying modification of permanent support.

Frank, unemployed at the time of each order he attacks, contends the trial court (1) improperly applied the capacity to earn standard when determining permanent support at a time he was unemployed; (2) abused its discretion in not reducing the permanent support payments upon his

showing changed circumstances for both himself and Marvelle; (3) erred in awarding attorney's fees to Marvelle without considering his present ability to pay; (4) the trial court's ruling refusing to modify the permanent support is void for lack of jurisdiction because the trial judge had no power to personally retain jurisdiction over the case. He claims the cumulative procedural and substantive irregularities deprived him of fair hearings. We affirm the judgment and the posttrial orders. Although the posttrial motions were erroneously transferred to the trial judge on the basis of a desire to retain personal jurisdiction this fact did not deprive that judge of authority to render a valid decision.

## DISCUSSION

### I

Frank contends the trial court improperly applied the capacity to earn standard to determine his support obligations, because no evidence justifies applying a punitive standard rather than one based on ability to pay.

■ It has long been the rule the court can consider the payor's earning capacity when determining child or spousal support. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 642 [183 Cal.Rptr. 508, 646 P.2d 179]; *Meagher* v. *Meagher* (1961) 190 Cal.App.2d 62, 64 [11 Cal.Rptr. 650]; *Pencovic* v. *Pencovic* (1955) 45 Cal.2d 97, 100, 101 [287 P.2d 501]; *Webber* v. *Webber* (1948) 33 Cal.2d 153, 160 [199 P.2d 934]; *Baron* v. *Baron* (1970) 9 Cal.App.3d 933, 943 [88 Cal.Rptr. 404].) However, this rule has been applied only where the parent has demonstrated a willful intention to avoid fulfilling financial obligations through deliberate misconduct. (*Philbin* v. *Philbin* (1971) 19 Cal.App.3d 115, 121 [96 Cal.Rptr. 408]; *In re Marriage of Hurtienne* (1981) 126 Cal.App.3d 374, 378 [178 Cal.Rptr. 748]; *In re Marriage of Johnson* (1982) 134 Cal.App.3d 148, 158 [184 Cal.Rptr. 444]; *In re Marriage of Reese* (1977) 73 Cal.App.3d 120, 125 [140 Cal.Rptr. 589]; *In re Marriage of Williams* (1984) 155 Cal.App.3d 57, 62 [202 Cal.Rptr. 10].)

Recently, the Legislature enacted statutory guidelines by which to calculate support payments (Civ. Code,[1] § 4720 et seq.)[2] to promote fair and adequate child support awards and avoid substantial variation in awards among similarly situated families. (*In re Marriage of Kepley* (1987) 193 Cal.App.3d 946, 951 [238 Cal.Rptr. 691].)

"Discretionary factors like the child's need and the parent's ability to pay are considerations for an award greater than the mandatory minimum but

---

[1] All statutory references are to the Civil Code unless otherwise specified.

[2] Section 4720 et seq. is generally known as the Agnos Child Support Standards Act of 1984 (Act).

[are] not [considered] in determining and allocating the mandatory minimum." (*In re Marriage of Hanchett* (1988) 199 Cal.App.3d 937, 943 [245 Cal.Rptr. 255]; *In re Marriage of Kepley, supra,* 193 Cal.App.3d at pp. 951, 953.) Under the Act, child support must be awarded at the mandatory minimum level unless exceptional circumstances are demonstrated. (§ 4720, subds. (d) & (e).)[3] A specific formula is provided to derive the level of support which equates to the aid to families with dependent children (AFDC) standards. "[D]ependent upon the financial ability of each parent to do so, no child receives a support award less than would otherwise be established as the need for that child under the AFDC program." (§ 4720, subd. (d).)

To determine a parent's ability to pay the mandatory minimum child support, courts must consider the parent's ability to earn to the extent consistent with the best interests of the children. (§ 4721, subd. (a).) "The above quoted section of the [Agnos] Act appears to alter the historically punitive nature of such a consideration, mandating it 'to the extent consistent with the best interests of the child. . . .' Indeed, consideration of earning capacity appears to be one of the very few areas in the Act where the trial court has some discretionary input in the otherwise lockstep computation and allocation of the minimum award." (*In re Marriage of Nolte* (1987) 191 Cal.App.3d 966, 973 [236 Cal.Rptr. 706].)

■   We find the Act to be consistent with previous decisional law and the reading of the two together creates a three-prong test before the capacity to earn standard may be applied. Earning capacity is composed of (1) the ability to work, including such factors as age, occupation, skills, education, health, background, work experience and qualifications; (2) the willingness to work exemplified through good faith efforts, due diligence and meaningful attempts to secure employment; and (3) an opportunity to work which means an employer who is willing to hire. (14 Words and Phrases (1952) Earning Capacity, pp. 27-28; *West* v. *Industrial Acc. Com.* (1947) 79 Cal.App.2d 711, 722 [180 P.2d 972].)

If all three factors are present, the court must apply the earning capacity standard to derive the mandatory minimum support payment to the extent the application is consistent with the needs of the child. The court may also

---

[3] Clearly the intent of the Legislature is not to allow support levels so onerous that the parent falls below the poverty level. "While section 4725 requires the court to remember the underlying goals of the Agnos Act, it also provides that a court shall not order a child support award that would have the effect of reducing a parent's net income to an amount less than that established as the minimum necessary for a person under the AFDC Program." (*In re Marriage of Bailey* (1988) 198 Cal.App.3d 505, 508-509 [243 Cal.Rptr. 776]; *Domestic Relations; child support,* (1984) 16 Pacific L.J. 653-655.)

take a parent's ability to pay into account in setting an amount greater than the mandatory minimum. When the ability to work or the opportunity to work is lacking, earning capacity is absent and application of the standard is inappropriate. When the payor is *unwilling* to pay and the other two factors are present, the court may apply the earnings capacity standard to deter the shirking of one's family obligations.

## II

For the 20 years and 9 days of Frank and Marvelle's marital cohabitation he was gainfully employed. When they separated Frank was ordered to pay Marvelle $215 for each of two children then residing with her and $220 a month for her support. At the time of this December 18, 1984, order and continuing until April 1985, Frank earned $29,000 a year as a customer accounts supervisor. One month after the order was entered, one child became a full-time resident in Frank's care. From April 1985 until February 1986, Frank was employed as a senior cost accountant at $31,800 per year. He voluntarily left that employment and, at least until November 2, 1987, remained unemployed.

Of significance to the disposition of the issues on this appeal is that Frank, although fully employed from November 1984 through February 1986, paid a mere $910 in combined spousal and child support, and that during the first two months.[4] By May 29, 1986, with credit for a prorated reduction from the date his son ceased residing with Marvelle, his arrearages amounted to $7,683.60. Not surprisingly, he was found in contempt for willfully failing to pay, a finding he does not contest, and which resulted in a 60-day suspended sentence. We believe it especially significant that Frank was satisfied to remain employed at $31,800 per year from January 16, 1985, through November 20, 1986, while accumulating support arrearages of $5,053.18 and it was only after he was ordered to appear on contempt proceedings on January 16, 1986, that he relieved his attorney, substituted himself in pro. per., and then quit his job before the hearing in February 1986.

After voluntarily terminating employment, Frank returned to court from time-to-time in renewed motions re contempt, in an attempt to avoid execution of the suspended sentence, a motion to reduce the temporary order, and to contest the setting of a permanent support order. It is in light of this historical background we evaluate the court's implied finding that Frank's claim to be unable to find any gainful employment for almost two years was

---

[4] Frank claims he is entitled to another $150-$300 in credits for direct payments for necessities. Assuming the correctness of this position, we find it of no significance in our determination.

a sham employed to avoid paying support to family members not residing with him.

■ We believe a trial court is justified in finding the above history relevant when assessing Frank's claimed two-year lack of employment opportunity, particularly the acknowledged fact that for more than one year while earning a substantial income he willfully refused to make even token payments to support his wife and child not residing with him. It is perhaps understating it to suggest that Frank's claims not only seem incredible, but based upon his past lengthy willful disobedience to the court orders for support, strongly suggest his failure to find employment reflects his desire to avoid moral and legal obligations to support his family.

The record itself clearly supports the trial court's belief Frank "could go to work if he wanted to go to work . . . ." Frank's moving papers and the oral proceedings are replete with conclusory assertions of his inability to obtain employment in positions either within or outside the financial and cost accounting career field for which he admittedly is highly trained. Indeed, he cites his lengthy professional experience, education and expertise as a hinderance to his finding employment. That is, prospective employers perceive him as overqualified to be a stable employee for jobs in less technical fields. "Stable," at least in the employers' view, means an employee whose immediate employment potential is not in a skilled job or professional capacity significantly more demanding than the vacancy a particular employer needs to fill; one who is not likely to move to a "better" job in the immediate future.

We find the only relevant evidence concerning Frank's inability to find employment consists of his declaration of August 21, 1987; and testimony he gave during the dissolution trial. He grossed $31,800 per year from April 15, 1985, through the end of February 1986, at which time he claims to have left the job because it had been misrepresented to him. He stated, "[w]ell, basically, I was told that the department—I went with the company because it was supposed to grow. It didn't grow. There was supposed to be help coming in the department. There wasn't. I was working 60 to 70 hours a week doing tasks that were not associated with my position, with what should have been." He then stated he had no alternative but to quit. If nothing else, Frank's elitist attitude at a time he was being threatened with contempt procedures for not complying with court ordered support payments is not designed to instill confidence in his claim of inability to find any income-producing employment thereafter. On the date of this testimony, April 14, 1987, Frank was representing himself and had introduced no evidence relating to why, in light of his continuous ability to remain gainful-

ly employed while supporting his family for more than 20 years, that for more than one year following February 1986, he was unable to do so.

However, in his posttrial declaration of August 1987 supporting a motion to modify support, Frank lists more than 200 companies he claims to have contacted from March 1986 through August 12, 1987, seeking employment as financial analyst, cost accountant, tax professional, auditor and related professional positions. The list contains notations that in many cases he received a negative reply, and in others his inquiry elicited no response. Included also were a significant number of letters in response, none of which offered employment. Although most returns indicated there was either no opening, his training and background did not fit the employment slot to be filled, or some other person had been selected, at least one referred to his being overqualified for their entry-level position. Frank's declaration states, "[s]ince March, 1986, I have been diligently searching for a position" and he has existed on governmental assistance and food stamps. He refers to having a bachelor degree in business administration and alleges he has "applied at every conceivable place where I might receive employment. The problem that I am finding is that many people are afraid to hire me because they feel that I might leave for another job, if they hire me at the salary they are offering me, which is often one-half my prior salary. Therefore they consider me over-qualified for many jobs." Suffice to say there is no evidentiary support in this record for this conclusion. However, then he goes on to allege "I am in competition with CPA's and MBA's; I do not have those Degrees; and therefore, those individuals are preferred over me. This has been a problem in finding work." This is not disputed, but its overall relevance to the issue we address, whether Frank deliberately remained unemployed, is minimal. Although some employment opportunities in the financial field may force Frank to compete with persons having more impressive credentials, there is no evidence this is the case. It is hardly likely Frank expected the trial court to believe he lost any opportunities in the fast food or janitorial services industries because of such competition. Nor, has he introduced evidence to support an inference he was denied employment in service-related employment areas because of his purported "over qualification."[5]

---

[5] Interestingly, in his declaration Frank asked the court to take note that although his wife had lost her employment as an optometric assistant, she apparently works with a group called Network U.S.A., and has started a cleaning service. Further, that she takes care of a yard surrounding the duplex in which she lives for which she receives credit in reduced rent. Nowhere does he suggest any such willingness to engage in that kind of employment to support either himself or his family. This is significant because the court repeatedly emphasized Frank could not limit his employment search to jobs he preferred and thus avoid his financial obligations to support.

The court continued execution of the sentence imposed for the multiple contempts several times to permit Frank to find employment. On one occasion the court stated "I believe

The facts in this case are not unlike those in *Meagher* v. *Meagher, supra,* 190 Cal.App.2d 62, where the husband voluntarily reduced his income from $2,083 per month to $624.05 at the time he deserted his family. There, as here, nothing other than a reluctance to continue to meet familial financial obligations triggered the abrupt change in employment status. Frank quit a well-paid position without concern for his legal and moral obligations to his family and without first securing alternative employment. His excuse was that he found the work too burdensome. On this factual record, the speciousness of this purported justification for leaving his job and Frank's deliberate flaunting of the temporary support orders for 16 months while employed are factors supporting the trial court's considering Frank's earning capacity when setting permanent support and in denying his motion to reduce the temporary support order.

Frank concedes his willful failure to make direct payments while gainfully employed is a factor which could support an inference his current unemployed status was intentional. He claims, however, such an inference is negated because he "voluntarily accepted custody of and full financial responsibility for" his teenage son during that period, and thus he cannot be viewed as a "skip-out" father. His syllogism is flawed. Essentially, he is a "skip-out" *spouse* and his failure is in not supporting his ex-wife and child not in his custody. Historically, Frank always supported those family members who lived with him. Since the parties separated, he has just as consistently failed to support those who do not.

Viewed in light of the entire background which clearly establishes Frank deliberately refused to pay child and spousal support when well able to do so, his voluntarily leaving employment to which he objected merely because he found it arduous, and the lengthy period of unemployment during which Frank's efforts to enter the labor market appear to be limited to job seeking in the cost accounting/auditing field, and his apparent unwillingness to make reasonable efforts to accept either temporary or permanent hire in service industries which had been tendered, the evidence fully supports the court's implied finding his avoidance of family financial responsibilities was deliberate.

---

[Frank] could go to work if he wanted to go to work, and possibly he can't find a position he'd like to have, a lot of us can't, but there has been no effort to pay support in this matter for a substantial period of time." It was not until October 7, 1987, that the last 50 days stayed on the previous contempt was ordered served. Moreover, on an earlier occasion, Frank's attorney represented to the court that Frank had been offered employment in two entry-level positions, but purportedly had been unable to accept them because of some undefined court appearances which interfered. However, he produced no evidence to that effect and, if the attorney's representation is accepted as factual, it would suggest Frank has employed every possible excuse to avoid employment, rather than accepting the job opportunities.

## III

After the court set permanent support in the judgment of dissolution, Frank promptly moved to have it reduced or terminated. He again cited his lengthy unemployment, his numerous attempts to find work, and changed circumstances concerning Marvelle's income and reduced financial need. Marvelle countered with an order to show cause re contempt and request the previously suspended sentence be executed. These combined matters were first scheduled to be heard in superior court, department K, and were called in front of the Honorable Jeffrey Miller who noted the record suggested the trial judge may have expressed an interest to retain ongoing personal jurisdiction. Judge Miller conditionally retained jurisdiction, but ordered the parties to first appear before the trial judge, the Honorable Frank Mitchell, to determine if he had intended to retain personal jurisdiction over all future matters, or only the suspended contempt sentence. Judge Miller specified that unless Judge Mitchell determined he had retained jurisdiction over all future litigation between these parties, the issues relating to Frank's motion for modification would be returned to department K. When confronted, Judge Mitchell declared he had intended to retain personal jurisdiction over all further family law issues in the case and, over strenuous objection, proceeded to deny modification. Frank claims Judge Mitchell's order is void for lack of jurisdiction.

Jurisdiction lies in the court and not a particular judge. (*People* v. *Osslo* (1958) 50 Cal.2d 75, 103 [323 P.2d 397]; see also 2 Witkin, Cal. Procedure (3d ed. 1985) § 50, Courts, p. 65.) The *Osslo* court held "[a]n individual judge (as distinguished from a court) is not empowered to retain jurisdiction of a cause. The cause is before the court, not the individual judge of that court, and the jurisdiction which the judge exercises is the jurisdiction of the court, not of the judge." (*People* v. *Osslo, supra,* 50 Cal.2d at p. 104.)

This principle applies to postdissolution proceedings. In *In re Marriage of Matthews* (1980) 101 Cal.App.3d 811, 815-816 [161 Cal.Rptr. 879], the appellate court held the trial court's personal retention of jurisdiction was beyond the court's authority. Here, also, Judge Mitchell was without power to reserve personal jurisdiction over this cause. Thus, an order to that effect was beyond the court's jurisdiction and could not have been enforced. (*Id.* at p. 816.)

Judge Miller erred in removing the matter from his calendar solely in deference to Judge Mitchell's desire to retain jurisdiction. However, the legal unenforceablity of a jurisdictional retention order does not affect the jurisdiction of the ordering judge once the matter comes before him. Frank

did not petition this court to prohibit the transfer to Judge Mitchell, choosing instead to attempt to persuade him to remand the matter to department K where it had been regularly assigned. Although his objections were sound, he was unsuccessful.

Frank argues the invalidity of the order retaining personal jurisdiction renders Judge Mitchell's orders void for lack of jurisdiction. He cites no authority for his proposition, apparently equating the lack of power to enforce an order of personal retention with a lack of authority to decide the matter once it is before the ordering judge. We have found no reported case precisely on point. However, in *In re Christian J.* (1984) 155 Cal.App.3d 276 [202 Cal.Rptr. 54], the court considered the effect of an erroneous denial of a peremptory challenge pursuant to Code of Civil Procedure section 170.6. After reciting related precedent, the court concluded an erroneous denial of a motion to disqualify did not deprive the particular judge of subject matter jurisdiction and the "jurisdictional" defect was one which could be waived. Here, however, Judge Mitchell was not disqualified from hearing this matter merely because it was improvidently transferred to him and he never lacked jurisdiction to decide these issues. Thus, there is no need to find any waiver by a failure to object. Judge Mitchell's decisions were not in "excess of jurisdiction."

### IV

■ Frank's declaration in support of his motion to modify the permanent spousal support alleges Marvelle was cohabiting with a person of the opposite sex. If proved, that fact would permit the court to modify support accordingly. (§ 4801.5.) Further, proof of cohabitation establishes a rebuttable presumption of a decreased need for support. (§ 4801.5.)

Frank contends the court erred in not finding he established the presumption of a reduced need for support because Marvelle did not affirmatively deny the cohabitation. However, the court's statements clearly show it did not find that cohabitation had been proved. Frank introduced only his unsupported conclusory allegation; Marvelle's declaration identifies the alleged male cohabitant as a "tenant" whose "rental" contribution was listed on her income and expense declaration. On this record there is ample support for the court's determination that cohabitation had not been proved. Lacking that, no rebuttable presumption was established.

### V

■ Frank contends the court's award of $750 for attorney's fees incurred by Marvelle was not based on a proper showing of her need and his

ability to pay. However, the court was fully cognizant of the financial positions of each party and, we must presume, the standards set forth in sections 4370 and 4370.5 relating to such awards. Having determined the court properly considered Frank's capacity to earn when establishing the support levels, we are satisfied this modest attorney's fee award is well within the court's discretion.

Judgment of dissolution and posttrial orders are affirmed.

Kremer, P. J., and Froehlich, J., concurred.